846 A.2d 604

KAROL MAW, PLAINTIFF–RESPONDENT, v. ADVANCED CLINI-CAL COMMUNICATIONS, INC., AND MICHAEL F. FORTE, PRESIDENT, ADVANCED CLINICAL COMMUNICATIONS, INC., DEFENDANTS–APPELLANTS.

Argued February 2, 2004—Decided May 4, 2004.

440

442

*Debbie Rodman Sandler,* argued the cause for appellants (*White and Williams,* attorneys).

*Richard M. Schall,* argued the cause for respondent (*Schall & Barasch,* attorneys; *Mr. Schall* and *Patricia A. Barasch,* on the briefs).

*Mark A. Saloman* and *John J. Sarno,* argued the cause for *amicus curiae* Employers Association of New Jersey (*Proskauer Rose,* attorneys; *Marvin M. Goldstein,* of counsel; *Mr. Saloman, Mr. Sarno, Mr. Goldstein* and *Richard S. Reig,* on the brief).

*Alan H. Schorr,* argued the cause for *amicus curiae* National Employment Lawyer's Association–New Jersey (*Alan H. Schorr & Associates,* attorneys).

*David M. Wissert,* submitted a brief on behalf of *amicus curiae* New Jersey Defense Association (*Lowenstein Sandler,* attorneys; *Mr. Wissert, Lauren M. Hollender* and *Martha L. Lester,* on the brief).

PER CURIAM.

Plaintiff, Karol Maw, filed this action under the Conscientious Employment Protection Act, *N.J.S.A.* 34:19–1 to –8 (CEPA), after she was terminated for refusing to execute an employment agreement containing a do-not-compete provision. She claimed that her employer committed impermissible retaliatory action when it terminated her employment because she refused to sign an employment agreement that she perceived to be contrary to public policy. We disagree and reverse the judgment of the Appellate Division, substantially for the reasons expressed in the cogent dissent by Judge Cuff. *Maw v. Advanced Clinical Communications, Inc.,* 359 *N.J.Super.* 420, 442–48, 820 *A.*2d 105, 118–122 (App.Div.2003) (Cuff, J.A.D., dissenting). Briefly, we add the following in explanation of our conclusion that plaintiff has failed to present a cause of action under CEPA.

I.

CEPA prohibits an employer from taking retaliatory action against an employee who "objects to, or refuses to participate in any activity, policy or practice which the employee reasonably

believes ... is incompatible with a clear mandate of public policy concerning public health, safety or welfare or protection of the environment." *N.J.S.A.* 34:19–3c(3) (Section 3c(3)). In this case we confront for the first time a question as to the meaning of the phrase "clear mandate of public policy." More specifically, we must determine the contours and scope of a "clear mandate" sufficient to assert a claim under Section 3c(3). We begin with the observation that a public policy expressed in the form of a statute, rule or regulation promulgated pursuant to law, is not what was meant under Section 3c(3). To so hold would reduce *N.J.S.A.* 34:19–3c(1) (Section 3c(1)) to mere surplusage, since it employs those legal precepts as a frame of reference for evaluating an employer's conduct.

■   That said, Section 3c(1) is helpful in resolving the question before us. Like Section 3c(1), the reference in Section 3c(3) to a "clear mandate of public policy" conveys a legislative preference for a readily discernable course of action that is recognized to be in the public interest. A "clear mandate" of public policy suggests an analog to a constitutional provision, statute, and rule or regulation *promulgated pursuant to law* such that, under Section 3c(3), there should be a high degree of public certitude in respect of acceptable verses unacceptable conduct. Indeed, prior decisions involving CEPA claims have reasoned similarly when discussing Section 3c(3) claims. *E.g., Higgins v. Pascack Valley Hosp.,* 158 *N.J.* 404, 420, 730 *A.*2d 327, 336 (1999) (citing *Mehlman v. Mobil Oil Corp.,* 153 *N.J.* 163, 189–90, 707 *A.*2d 1000, 1013–1014 (1998) (finding that CEPA "prohibits employer retaliation against an employee who objects to an employer practice that violates a foreign country's public policy, as expressed in an industry safety guideline")). The legislative approach vis-à-vis a "clear" mandate of public policy bespeaks a desire not to have CEPA actions devolve into arguments between employees and employers over what is, and is not, correct public policy. Such an approach also fits with the legislative requirement of a "mandate" as opposed to

a less rigorous standard for the type of public policy that is implicated.

The dissent below is in accord with our analysis in respect of its discussion of both the purpose of CEPA, *Maw, supra,* 359 *N.J.Super.* at 444–446, 820 *A.*2d at 119–121 (Cuff, J.A.D., dissenting), and our precedent construing CEPA. *Id.* at 446–47, 820 *A.*2d at 120–21. Judge Cuff's summary of CEPA's purpose echoes our observation last term that "[t]he Legislature enacted CEPA to 'protect and encourage employees to report illegal or unethical workplace activities and to discourage public and private sector employers from engaging in such conduct.'" *Dzwonar v. McDevitt,* 177 *N.J.* 451, 461, 828 *A.*2d 893, 900 (2003) (quoting *Abbamont v. Piscataway Twp. Bd. of Educ.,* 138 *N.J.* 405, 431, 650 *A.*2d 958, 971 (1994)). As stated in *Dzwonar, supra,* CEPA is designed to "'prevent retaliation against those employees who object to employer conduct that they reasonably believe to be unlawful or *indisputably dangerous to the public health, safety or welfare.*'" 177 *N.J.* at 464, 828 *A.*2d at 901 (quoting *Mehlman v. Mobil Oil Corp.,* 153 *N.J.* 163, 193–94, 707 *A.*2d 1000, 1015–1016 (1998) (emphasis added)). The dissent found "that a helpful limiting principle [for CEPA claims] is that the offensive conduct must implicate the public interest." *Maw, supra,* 359 *N.J.Super.* at 446, 820 *A.*2d at 120 (Cuff, J.A.D., dissenting) (citing *Mehlman, supra,* 153 *N.J.* at 187–88, 707 *A.*2d at 1012–1013). "[T]he offensive activity must pose a threat of public harm, not merely private harm or harm only to the aggrieved employee." *Mehlman, supra,* 153 *N.J.* at 188, 707 *A.*2d at 1013. We reaffirm the limiting principle enunciated in *Mehlman* that the complained of activity must have public ramifications, and that the dispute between employer and employee must be more than a private disagreement.

## II.

In this matter, plaintiff's dispute with her employer is private in nature. Plaintiff concedes that she possessed confiden-

tial and proprietary information, and that she had no objection to those portions of the noncompete agreement that would preclude her from sharing such information with future employers. In other words, plaintiff's true dispute was over the reasonableness of the terms of the noncompete agreement, an argument she was free to make if and when her employer tried to prevent her from working at another company. It is telling that plaintiff uniformly refers to the effect that signing the noncompete agreement would have on "*her* ability to find employment in *her* field," and that "she believed that there was no legitimate business reason for defendants to require *her* to enter into a noncompete agreement." (Emphasis added). Allowing plaintiff's admittedly private dispute with her employer to go forward under CEPA's rubric dilutes the statute's salutary goals.

■ The private nature of plaintiff's dispute notwithstanding, her CEPA claim must fail because our State's public policy respecting noncompete agreements is not set forth in a "clear mandate," and does not "concern[ ] the public health, safety or welfare or protection of the environment." *N.J.S.A.* 34:19–3c(3). Over a generation ago, our Court sketched the broad parameters for determining whether a noncompete agreement was unenforceable. *Whitmyer Bros., Inc. v. Doyle,* 58 *N.J.* 25, 274 *A.*2d 577 (1971); *Solari Indus., Inc. v. Malady,* 55 *N.J.* 571, 264 *A.*2d 53 (1970). In *Solari,* we canvassed, much as has the dissent, the historical treatment of noncompete agreements, and acknowledged the previously held negative view of such agreements. 55 *N.J.* at 575–84, 264 *A.*2d at 55–60. We cited academic writings on the topic that elaborated in greater detail on the relation of such agreements to Anglo–American commercial practices. *See, e.g., Solari, supra,* 55 *N.J.* at 574–77, 264 *A.*2d at 54–56 (citing Harlan M. Blake, *Employee Agreements Not to Compete,* 73 *Harv. L. Rev.* 625 (1960)).

■ But *Solari* was a turning point, for we held then "that the time is well due for the abandonment of New Jersey's void per se rule in favor of the rule which permits the total or partial

enforcement of noncompetitive agreements to the extent reasonable under the circumstances." 55 *N.J.* at 585, 264 *A.*2d at 61. In *Whitmyer, supra,* we expanded on *Solari,* establishing what is now known as the *Solari/Whitmyer* test for determining whether a noncompete agreement is unreasonable and therefore unenforceable. Under the *Solari/Whitmyer* test, a noncompete agreement is enforceable "if it 'simply protects the legitimate interests of the employer, imposes no undue hardship on the employee and is not injurious to the public.'" *Ingersoll–Rand Co. v. Ciavatta,* 110 *N.J.* 609, 628, 542 *A.*2d 879, 888 (1988) (quoting *Whitmyer, supra,* 58 *N.J.* at 32–33, 274 *A.*2d at 581). The first two prongs of the test require a balancing of the employer's interests in protecting proprietary and confidential information and the asserted hardship on the employee. *Ingersoll–Rand, supra,* 110 *N.J.* at 634–35, 542 *A.*2d at 892. The third requires the reviewing court to analyze the public's broad concern in fostering competition, creativity, and ingenuity. *Id.* at 639, 542 *A.*2d at 894. *Solari/Whitmyer* has now become an accepted part of the common law, not only in New Jersey but also in other jurisdictions around the country. *Id.* at 630–34, 542 A.2d at 889–92.

Although our dissenting colleagues may contend that do-not-compete provisions are, or should be, *per se* illegal, in point of fact, they are not illegal *per se.* It is not accurate to describe our current caselaw, which allows enforcement of reasonable noncompete agreements, as a "clear mandate" that disfavors such agreements. The *Solari/Whitmyer* test is a multi-part, fact-intensive inquiry. Not only must multiple interests of differing parties and entities be identified, but also, those interests must be gauged for reasonableness and legitimacy. The application of that test here, and as a general matter, simply does not evoke the type of a "clear mandate of public policy" that was contemplated by *N.J.S.A.* 34:19–3c(3).

We are informed by the *amici* that non-compete agreements are a common part of commercial employment. We do not accept as a premise that employers, in large numbers, are engaging in a

practice that is "indisputably dangerous to the public health, safety or welfare." *Dzwonar, supra,* 177 *N.J.* at 464, 828 *A.*2d at 901. It is more appropriate to characterize the business community as having adapted to the *Solari/Whitmyer* approach that recognizes that noncompete agreements can serve a useful purpose so long as the agreement is not unreasonable.

We conclude that plaintiff's private dispute over the terms of the do-not-compete provision in her employment agreement does not implicate violation of a clear mandate of public policy as contemplated by Section 3c(3) of CEPA. As previously noted, plaintiff did have options available to her. If she could not negotiate terms that were to her liking, she was free to dispute the reasonableness of those terms if and when her employer attempted to enforce the agreement. The burden then would be on the employer to hire counsel and initiate enforcement litigation, *Solari, supra,* 55 *N.J.* at 574, 264 *A.*2d at 54–55, and nothing would preclude an employee-defendant in such an action from asserting any and all affirmative defenses and counterclaims. *Ingersoll–Rand, supra,* 110 *N.J.* at 621–22, 542 *A.*2d at 884–85. What we decline to do, however, is to alter the traditional contract remedies available in restrictive-covenant litigation by recasting the dispute as a CEPA action. See *N.J.S.A.* 34:19–5e, –5f.

### III.

The judgment of the Appellate Division is reversed.

Justice ZAZZALI, dissenting.

As fully set forth in the majority opinion of the Appellate Division, the facts of this case concern an employee who was fired for refusing to sign a non-compete agreement. She brought suit against her employer, alleging that her termination violated the Conscientious Employee Protection Act (CEPA), *N.J.S.A.* 34:19–1 to –8, and her common-law right against discharge contrary to public policy. Because the allegations of the complaint implicate a

clear mandate of public policy that the majority, in adopting the dissent below, fails to apprehend, I must respectfully dissent.

## I.

This case comes to the Court on a motion to dismiss for failure to state a claim. Therefore, the facts as alleged in the complaint, as well as all reasonable inferences to be drawn therefrom, must be taken as true. *Craig v. Suburban Cablevision, Inc.*, 140 *N.J.* 623, 625–26, 660 *A.*2d 505–06 (1995).

In 1997, plaintiff Karol Maw began working for defendant Advanced Clinical Communications, Inc., as a graphic designer. Plaintiff had been performing well enough to warrant a promotion to the position of Senior Graphic Designer in January 2000. Thereafter, pursuant to a new company policy promulgated in January 2001, defendant required all of its employees at or above the level of "coordinator" to sign a non-compete agreement as a condition of continuing employment. Among other things, it provided that upon ceasing to work for defendant, the employee would be enjoined from working for any competitor or customer of defendant for a period of two years.

Plaintiff was presented with a copy of the proposed "Noncompete Covenant," which informed her that she was free to seek the advice of counsel with respect to the document. Plaintiff consulted her father, an attorney, who suggested some changes. Plaintiff presented those revisions to defendant's Human Resources Department. A representative of that department informed her, however, that "it is the President's [c]ompany and ... he is not going to make any exceptions." Plaintiff did not sign the document, prompting defendant to inform her by letter that she had been "terminated based on noncompliance with company policy."

Plaintiff filed suit, claiming that her employer violated CEPA and the common-law right against termination in violation of a clear mandate of public policy. Defendant moved to dismiss the claim for failure to state a claim upon which relief can be granted. *R.* 4:6–2(e). The Law Division granted the motion, finding that

the complaint failed to aver a sufficient public-policy interest within the meaning of CEPA and that, similarly, it lacked the requisite showing to state a claim under the common law.

The Appellate Division reversed. *Maw v. Advanced Clinical Communications, Inc.*, 359 *N.J.Super.* 420, 820 *A.*2d 105 (2003). It held that the Law Division erred in concluding that as a matter of law, plaintiff did not demonstrate a violation of public policy necessary to sustain a cause of action. *Id.* at 427, 820 *A.*2d at 109. Instead, because the agreement proffered by defendant "may, depending on the surrounding circumstances, violate the public policy necessary to support a cause of action under CEPA[,]" the court ruled that "dismissal of plaintiff's claims before she had an opportunity to develop her case through discovery was premature." *Ibid.* For similar reasons, the court also reinstated plaintiff's common-law claim for wrongful discharge in violation of public policy, as recognized in *Pierce v. Ortho Pharmaceutical Corp.*, 84 *N.J.* 58, 72, 417 *A.*2d 505, 512 (1980).[1] *Id.* at 441, 820 *A.*2d at 117–18 .

The dissent, however, stated that the Law Division did not err in dismissing the complaint, because "an employee's interest in freely moving from employer to employer is primarily a private interest beyond the protection provided by CEPA." *Id.* at 442, 820 *A.*2d at 118 (Cuff, J.A.D., dissenting). Consequently, the dissent viewed the matter as "essentially a private dispute between an employer and an employee." *Id.* at 448, 820 *A.*2d at 122. Determining no clear mandate of public policy to be at issue, the dissent

---

[1] Because the same test concerning the requisite demonstration of public policy applies under *Pierce*, the Appellate Division held that plaintiff stated a claim under the common law. *Maw, supra*, 359 *N.J.Super.* at 441, 820 *A.*2d at 117–18. The court went on to address the exclusivity provision of CEPA. It found that although a plaintiff who pursues a CEPA claim must forego a common-law claim, it would be unjust to force a party into making that decision at the pleading stage of the proceedings before a court has determined whether either action may lie. *Ibid.* I find both aspects of the Appellate Division's reasoning to be sound and, therefore, subsume the common-law cause of action into my analysis of the CEPA claim.

concluded that plaintiff failed to state a claim under either CEPA or the common law. *Ibid.*

Because of the dissent in the Appellate Division, defendant appealed as of right. *R.* 2:2–1(a)(2). This Court now adopts the analysis of the dissent below, finding no clear mandate of public policy sufficient to render this matter anything but a dispute merely "private in nature." *Ante* 179 *N.J.* at 445, 846 *A.*2d at 608. A brief look at the public-policy considerations that have traditionally governed non-compete agreements reveals, however, that this matter does, in fact, give rise to serious public-policy concerns that transcend a mere private dispute.

## II.

### A.

The Conscientious Employee Protection Act provides, in pertinent part, that

> [a]n employer shall not take any retaliatory action against an employee because the employee ... [o]bjects to, or *refuses to participate in any activity, policy or practice which* the employee reasonably believes ... *is incompatible with a clear mandate of public policy* concerning the public health, safety or welfare or protection of the environment.
>
> [*N.J.S.A.* 34:19–3 (emphasis added).]

The elements necessary to state a claim for wrongful termination under that provision of CEPA are not in dispute. A plaintiff

> must demonstrate that: (1) he or she reasonably believed that his or her employer's conduct was violating either a law, rule, or regulation promulgated pursuant to law, or a clear mandate of public policy; (2) he or she performed a "whistle-blowing" activity described in *N.J.S.A.* 34:19–3c; (3) an adverse employment action was taken against him or her; and (4) a causal connection exists between the whistle-blowing activity and the adverse employment action.
>
> [*Dzwonar v. McDevitt,* 177 *N.J.* 451, 462, 828 *A.*2d 893, 900 (2003).]

As in *Dzwonar,* the viability of the present claim hinges on whether the complaint satisfies the first prong of the four-prong test. That is, it appears clear that plaintiff meets the other three prongs because she refused to participate in an activity (*i.e.,*

entering into the agreement) and was fired as a direct consequence of that refusal. Thus, to survive a motion to dismiss, plaintiff need only set forth facts from which a factfinder ultimately could conclude that she acted on the basis of a reasonable belief that in demanding that she sign the non-compete agreement, her employer was violating a clear mandate of public policy. *Ibid.* And before a court can dismiss a CEPA claim as a matter of law, it must satisfy itself that no law, rule, or clear mandate of public policy "closely relates to the complained-of conduct." *Id.* at 463, 828 *A.*2d at 901.

## B.

For more than four hundred years, Anglo–American jurisprudence has recognized the public-policy implications of non-compete agreements. *See* Harlan M. Blake, *Employee Agreements Not to Compete,* 73 *Harv. L. Rev.* 625, 635–36 (1960) (tracing jurisprudence of post-employment restraints to *Dyer's Case* in Court of Common Pleas in 1414 and first public-policy explanation for invalidating them to *Colgate v. Bacheler,* decided by Queen's Bench in 1602). In the "most cited case on common-law restraints of trade," and perhaps the most influential opinion on the subject ever issued, Chief Justice Parker of Queen's Bench explored the interests, both public and private, at stake when a citizen contracts away his right to work at his chosen craft. Blake, *supra,* 73 *Harv. L. Rev.* at 629 (citing *Mitchel v. Reynolds,* 24 *Eng. Rep.* 347 (Q.B. 1711)).

In *Mitchel,* the defendant leased some buildings including a bakehouse to the plaintiff. 24 *Eng. Rep.* at 347. The terms of their agreement included a provision that the defendant would "not exercise the trade of a baker" within the parish of St. Andrew's Holborn during the five-year term of the lease. *Ibid.* If the defendant were to violate the term, and set up a competing shop, the plaintiff would be entitled to fifty pounds. *Ibid.* The plaintiff brought suit to enforce the provision; the defendant, however, maintained that the agreement was void. *Ibid.*

Examining prior case law, the Chief Justice discerned the various interests implicated by voluntary restraints of trade. *Id.* at 350. He observed that such agreements can result in "mischief . . . to the party, by the loss of his livelihood, and the subsistence of his family . . . [and] to the publick, by depriving it of a[ ] useful member." *Ibid.* The court then further explained the aggregate harm occasioned by such restrictions that extends beyond the concerns of the contracting parties:

> Another reason is, the great abuses these voluntary restraints are liable to; as for instance, from corporations, who are perpetually labouring for exclusive advantages in trade, and to reduce it into as few hands as possible; as likewise from masters, who are apt to give their apprentices much vexation on this account, and to use many indirect practices to procure such bonds from them, lest they should prejudice them in their custom, when they come to set up for themselves. [*Ibid.*]

The court acknowledged the circumstances in which such restrictive arrangements might be "useful and beneficial," for instance, "to prevent a town from being overstocked with any particular trade" or to facilitate the sale of a business or trade no longer profitable to its proprietor. *Ibid.* In weighing those competing considerations, however, the court concluded that the mischief "plainly appears . . . but the benefit (if any) can only be presumed." *Id.* at 351. Underscoring the point that the mischief is "not only private, but public," the court pronounced the rule to be that the law will presume such contracts *"prima facie* to be bad" until the facts of an individual case indicate that the restriction constitutes a "reasonable and useful contract" that "the courts of justice will [e]nforce[.]" *Ibid.*

Applying the rule to the facts of that particular case, the court held that the plaintiff had overcome the presumption of invalidity because it would have been unjust to allow the defendant to receive the benefit of the lease agreement while permitting him to renege on his promise to allow the plaintiff to have the benefit of the "trade in this neighborhood." *Id.* at 352. Finding the restraint to be "exactly proportioned to the consideration"—inasmuch as the five-year term of the restraint was coextensive with that of the lease—the court determined "the concern of the public

[to be] equal on both sides," and held the restriction enforceable. *Ibid.* Thus, the court kept public, as well as private, concerns keenly within its focus throughout its analysis.

Consistent with the approach in *Mitchel,* in New Jersey historically we have presumed such covenants to be invalid as restraints on trade and, therefore, violative of public policy unless an employer demonstrates the reasonableness of its agreement. *Mandeville v. Harman,* 42 *N.J. Eq.* 185, 189, 7 *A.* 37, 38–39 (Ch. 1886). *Mandeville* involved a doctor who, in exchange for an employment opportunity with an established practitioner, permanently bargained away his right to practice for anyone else in the City of Newark. *Id.* at 187–88, 7 *A.* at 38. As Vice Chancellor Van Fleet explained in refusing to enforce the agreement, the only covenants restricting employment that will be enforced are those in which

> the restraint is such only as to afford a fair protection to the interest of the party in favor of whom it is given, and not so large as to interfere with the interest of the public. Whatever restraint is larger than the necessary protection of the party can be of no benefit to either. It can only be oppressive, and if oppressive, it is, in the eye of the law, unreasonable and void, on the ground of public policy, as being injurious to the interests of the public. The rule, as thus stated, is the law of this state.
>
> [*Id.* at 190, 7 *A.* at 39.]

In another case involving a non-compete agreement, by which an employee had "restrained himself, generally and absolutely, without limitation as to time or place, from exercising his talents and skill in making gig-saddles and coach-pads," Vice Chancellor Fleet held that "such a contract is void, on account of its repugnancy to public policy." *Albright v. Teas,* 37 *N.J.Eq.* 171, 173 (Ch. 1883). Elaborating upon the public-policy implications of such a covenant, he explained, "It prevents competition, and thus enhances prices, and exposes the public to all the evils of monopoly." *Ibid.*

In more recent cases, we have echoed the concerns regarding restrictive covenants that originally were articulated in *Mitchel,* explicitly recognizing both the private and the public interests implicated by these restraints on trade. For instance, in *Solari*

*Industries, Inc. v. Malady,* 55 *N.J.* 571, 576, 264 *A.*2d 53, 56 (1970), we observed that public-policy considerations distinguish employee non-compete agreements from restrictions designed to protect the good will attendant to the sale of a business. We explained that although the latter are "freely enforceable," the former will meet with judicial approbation only if they "simply protect[ ] the legitimate interests of the employer, impose[ ] no undue hardship on the employee, and [are] not injurious to the public." *Ibid.* We subsequently reiterated that tripartite test, which expressly recognizes the public interest as distinct from the private concerns of the employer and employee. *Ingersoll–Rand Co. v. Ciavatta,* 110 *N.J.* 609, 628, 542 *A.*2d 879, 888 (1988); *Karlin v. Weinberg,* 77 *N.J.* 408, 411–12, 390 *A.*2d 1161, 1163–64 (1978); *Whitmyer Bros., Inc. v. Doyle,* 58 *N.J.* 25, 32, 274 *A.*2d 577, 580–81 (1971). As we recognized in *Ciavatta,* not least among the public-policy considerations is the desire to protect the consuming public from "naked restraints" on the marketplace posed by employer attempts to extinguish competition from a former employee. 110 *N.J.* at 635, 542 *A.*2d at 892.

This brief historical overview demonstrates that vindication of the *public* interest has consistently been at the heart of our interpretation of covenants-not-to-compete. More is at stake than merely the isolated subjugation of a single worker. Although the "undue hardship" prong of *Solari, supra,* takes that consideration into account, our jurisprudence, time and time again, has made clear that such restraints of trade implicate other, public interests. Such repeated instruction by the judiciary amounts to a clear mandate that overly restrictive covenants in restraint of future employment are in violation of New Jersey public policy.

Although the majority attempts to make much of this Court's rejection of the so-called *"per se"* rule in *Solari, supra,* 55 *N.J.* at 585, 264 *A.*2d at 60–61, it misconstrues the import of that holding. *Ante* 179 *N.J.* at 446–48, 846 *A.*2d at 608–09. Despite the majority's efforts to characterize *Solari* as a sea-change in our jurisprudence of non-compete agreements, it represents nothing of the sort.

The majority's conclusion in that regard and its claim that I am somehow arguing restrictive covenants "are, or should be, *per se* illegal," *ante* 179 *N.J.* at 447, 846 *A.*2d at 609, both appear to stem from a fundamental misunderstanding of the *"per se"* rule in pre-*Solari* case law.

The majority's gloss notwithstanding, non-compete agreements were not as a general rule *"per se* void" prior to *Solari.* Instead, the *per se* rule concerned specifically the severability of non-compete agreements that were found to be unenforceable as written. 55 *N.J.* at 583, 264 *A.*2d at 59–60. Prior to *Solari,* the courts of this State generally refused to reform and enforce such agreements to the extent that they otherwise might be reasonable. *Id.* at 583–84, 264 *A.*2d at 59–60. In other words, if an employer failed to draft an agreement enforceable on its face, courts usually would not reform such a contract, even though a particular non-compete arrangement might be reasonable if enforced on terms less restrictive than as written. *Id.* at 583, 264 *A.*2d at 59–60. Rather than re-write the contract for the parties, courts usually considered the inartfully drafted agreement to be void *per se. Ibid.* In *Solari,* however, we held that if an employer could demonstrate that its legitimate business interests would be protected, no undue harm would be visited on the employee, and that the public interest would not otherwise be injured, such a covenant would be enforced to the extent reasonable in time and space, despite the fact that it had been drafted in broader, unenforceable terms. *Id.* at 585, 264 *A.*2d at 60–61.

So understood, *Solari* does not represent a bold departure from prior case law treating non-compete agreements. Covenants not to compete were enforceable prior to our decision in that case. *See, e.g., Mandeville, supra,* 42 *N.J.Eq.* at 189–90, 7 *A.* at 38–39 (1886 opinion instructing that non-compete agreements will be enforced if limited to restrictions necessary to protect interests of obligee and not so restrictive that they interfere with public interest). *Solari* merely extended the concepts of severability and reformation of contract to non-compete agreements. Most tellingly,

however, neither *Solari* nor our subsequent cases removed the burden from the employer to demonstrate the reasonableness of non-compete agreements. And that burden continues to fall squarely on employers precisely because of the continuing public-policy concerns engendered by these restraints on trade.

### III.

In spite of the manner in which non-compete agreements consistently have been viewed, the majority adopts the assessment of the dissent below that "an employee's interest in freely moving from employer to employer is primarily a private interest beyond the protection provided by CEPA," *Maw, supra,* 359 *N.J.Super.* at 442, 820 *A.*2d at 118 (Cuff, J.A.D., dissenting), and, therefore, the present matter involves "essentially a private dispute between an employer and an employee." *Id.* at 448, 820 *A.*2d at 122. The difficulty with that approach is that it does not reckon with, much less reconcile, the vital public-policy considerations that undergird the jurisprudence of non-compete agreements. Simply put, for centuries the courts of England and of this State have stated repeatedly that covenants-not-to-compete implicate important public-policy interests. If there is any continuing truth to that notion, then a plaintiff who claims that she resisted signing an agreement that she believed to violate that public policy cannot be summarily cast out of court on the ground that her concerns constitute only a private dispute with her employer. In embracing such a rationale, the majority disserves both the remedial purpose of CEPA as well as the honorable tradition of protecting the free markets of this State. To be sure, as in all "private-sector" disputes, a private interest is involved. Here, however, the controversy clearly implicates long-established public concerns.

Defendant's alternative argument in support of its motion to dismiss proves equally unpersuasive. It posits that until it attempts to enforce the agreement, there is no way of telling whether or not the restriction is unreasonable. Thus, the argument runs, plaintiff could not have held a reasonable belief that

the covenant was in violation of public policy until the employer attempted enforcement. In support of that theory, defendant places particular weight on the clause of the proffered agreement that provides that permission to allow employees to work elsewhere will not be unreasonably withheld. The majority of this Court implicitly embraces that argument by observing that the deprivation of a CEPA cause of action does not leave plaintiff without a remedy inasmuch as she "was free to dispute the reasonableness [of the non-compete agreement] if and when her employer attempted to enforce the agreement." *Ante* 179 *N.J.* at 448, 846 *A.*2d at 609.

That reasoning stumbles on a number of levels. First, in stating that this employee was free to challenge this restrictive covenant in another forum, the majority fails to acknowledge that traditional contract remedies are inadequate to vindicate the public interest at stake in this type of dispute. Absent a cause of action under CEPA or the common law's public-policy exception to termination of an at-will employee, nothing prevents an employer from demanding that such an employee agree to the most unreasonably restrictive non-compete agreement as a condition of continuing employment. Should the employee refuse, today's holding allows the employer to terminate with impunity and leaves the employee but one avenue of real relief: find another job.

Second, the majority's approach ignores the obvious *in terrorem* effect such covenants have in restricting employee mobility. As plaintiff's counsel suggested at argument, once an employee has affixed his or her signature, the employer has derived its sought-after benefit, irrespective of whether a court ultimately deems the covenant reasonable or not. Few are the employees with the resources—or, for that matter, the prospective employers with the inclination—to effectively challenge even the most patently unreasonable restrictive covenant.

Third, as noted, the fundamental policy and law in this State is that covenants-not-to-compete are in violation of public policy until proven otherwise—that is, until the employer demonstrates that

they are reasonable. Consistent with that approach, in the CEPA context, as in common-law or equitable actions treating such agreements directly, the employer should bear the burden of demonstrating that in the circumstances of a particular case, the proffered agreement would have been enforceable as a reasonable restriction. In the CEPA context, as in the more traditional common-law scenario, that presents a question for the court. In either setting, however, that determination cannot be made on the pleadings. Although it is a question for the bench and not the jury, it constitutes an inquiry that must be made in conjunction with a review of the relevant facts. The outcome will hinge on, among other things, the legitimate business interests of the employer that are to be served by the restriction in relation to the geographic, temporal, and substantive restraints placed upon the employee. Although such an inquiry may prove possible at the summary-judgment stage of the proceedings—at which time, the employer may well prevail—a court bound by the averments of a complaint cannot make such a ruling on a motion to dismiss.

Accordingly, the better approach, which would adequately safeguard the concerns of the employer while simultaneously vindicating the public interest, would be to hold that a plaintiff has stated a claim under CEPA when she has alleged that she refused to sign a non-compete agreement that she believed to be in violation of public policy. The employer would then be afforded the opportunity to demonstrate the reasonableness of the proffered agreement as a defense to the action. On that basis, I would affirm the judgment of the Appellate Division and allow the complaint to go forward.

I am aware of the concern by some that allowing a cause of action in these and similar circumstances might have a chilling effect on employers' legitimate use of non-compete agreements, but that argument is unavailing. The approach I propose would have the salutary effect of encouraging employers to enter into agreements that comply with, rather than flout, sound public policy. Employers who do draft restrictive covenants tailored to

serve their legitimate business interests can be confident of prevailing against a subsequent challenge for wrongful dismissal under CEPA or the common law should they choose not to retain an at-will employee who refuses to agree to reasonable terms. Moreover, such employers will be able to enforce executed agreements incorporating those terms in a court of equity. Conversely, the fact that illegitimate agreements will be disfavored should present no cause for concern.

## IV.

In sum, I would hold that plaintiff has set forth allegations in her complaint that state a claim for wrongful termination under both CEPA and the common law. There exists in this State a clear mandate that overly restrictive non-compete agreements violate public policy. Plaintiff claims that she acted on the *bona fide* belief that her employer, in asking her to enter the agreement at issue here, sought to restrain her future employment without a legitimate reason and, thereby, violated that public policy. Consistency with our jurisprudence respecting non-compete agreements demands that employers should bear the burden of demonstrating that those suspect arrangements are reasonable in the circumstances of an individual case. Because this defendant has not done so and, indeed, cannot possibly have made such a showing on a motion to dismiss, I would affirm the judgment of the Appellate Division and remand the cause for further proceedings.

Justice LONG joins in this opinion.

*For reversal*—Chief Justice PORITZ and Justices VERNIERO, LaVECCHIA and WALLACE—4.

*For affirmance*—Justices LONG and ZAZZALI—2.