**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-3506-19

ALLOY, SILVERSTEIN,
SHAPIRO, ADAMS,
MULFORD, CICALESE,
WILSON & CO., P.A.,

     Plaintiff-Appellant,

v.

STEVEN L. SHAPIRO,

     Defendant-Respondent.

_____

Argued May 25, 2021 – Decided July 7, 2021

Before Judges Fisher, Gilson, and Moynihan.

On appeal from the Superior Court of New Jersey, Law Division, Camden County, Docket No. L-3746-19.

Steven E. Angstreich argued the cause for appellant (Weir & Partners, LLP, attorneys; Steven E. Angstreich, on the briefs).

William M. Tambussi argued the cause for respondent (Brown & Connery, LLP, attorneys; William M. Tambussi and Sean P. O'Brien, on the brief).

PER CURIAM

This appeal arises out of a dispute between an accounting firm and an accountant who had sold his interest in the firm, continued to work at the firm for thirty years, and then left to join a competing accounting firm. The legal issue is whether the departing accountant violated a restrictive covenant he signed in 1989, when he sold his interest in the firm.

Plaintiff Alloy, Silverstein, Shapiro, Adams, Mulford, Cicalese, Wilson & Co., P.A. (plaintiff or the Firm), appeals from an order granting summary judgment to defendant Steven Shapiro (defendant or Shapiro) on the basis that the restrictive covenant had terminated. The Firm argues that the restrictive covenant is still in effect and it is enforceable despite having no limitation on duration or geographic scope. Alternatively, the Firm contends that the trial court erred in not "blue pencil[ing]" the covenant. We disagree and hold that the restrictive covenant was terminated in 2004, when defendant's Consulting Agreement with the Firm ended.

I.

Before September 1987, Shapiro and two other accountants – Marvin Alloy and Raymond Silverstein – owned all the stock in a professional service corporation, which operated an accounting firm. The Firm was then known as

Alloy, Silverstein, Shapiro & Co., P.A., and was incorporated in and had its office in New Jersey.

On September 18, 1987, seven employees of the Firm (the Buyers) entered into an agreement to acquire the Firm (the Acquisition Agreement) from Shapiro, Alloy, and Silverstein (the Stockholders). The Acquisition Agreement called for the Buyers to purchase the stock of the Firm from the Stockholders in monthly installments over ten years.

The Acquisition Agreement also provided that the Stockholders would enter into a consulting agreement, under which they would practice as accountants only for the Firm. In that regard, paragraph 16.3 of the Acquisition Agreement stated, in relevant part:

> [T]he STOCKHOLDERS, shall have executed a consulting agreement, within which the STOCKHOLDERS shall covenant that all public accounting activities to be performed by them subsequent to the Closing shall be performed solely on behalf of [the Firm] until the complete satisfaction of the obligations of [the Firm] pursuant hereto to each such STOCKHOLDER shall have been satisfied in full, all in accordance with Section 21 hereinafter.

In addition, the Acquisition Agreement contained a restrictive covenant, in which the Stockholders agreed that "until the termination of this Agreement,"

3

they would practice public accounting for the Firm, and they would not compete with the Firm or solicit its clients to leave the Firm.

The details of how the Buyers were to pay the Stockholders were set forth in paragraphs 5 and 8 of the Acquisition Agreement. Those provisions stated that seventy-five percent of the payment to be made to the Stockholders was in consideration for the restrictive covenant and the remaining twenty-five percent was for the stock.

The post-closing relationship of the Stockholders to the Firm was set forth in paragraph 21 of the Acquisition Agreement. That provision described the consulting arrangement and stated that the Stockholders would only be working as public accountants for the Firm.

The duration of the Acquisition Agreement was set forth in paragraph 26. That provision stated that the agreement was to commence on the date of the closing and last until "the last payment due [to] the STOCKHOLDERS from BUYERS and [Firm] shall be made to STOCKHOLDERS."

On August 1, 1989, the Acquisition Agreement was amended, the acquisition closed, and the Stockholders and Buyers entered into a Consulting Agreement and a Restrictive Covenant Agreement. The amendments were set forth in a "Second Agreement to [the] Acquisition Agreement," which

4

principally amended provisions concerning the valuation of the stock and how payments would be made to the Stockholders.

The Consulting Agreement provided that the Stockholders would continue to perform public accounting for the Firm "until the complete satisfaction of the obligations of [the Firm] pursuant to the terms of the Acquisition Agreement." The Consulting Agreement also set forth a formula under which the Stockholders would be compensated for their services. In addition, the Consulting Agreement set forth how the consulting arrangement between the Stockholders and the Firm would terminate. In that regard, paragraph 10 of the Consulting Agreement stated:

> Upon the complete satisfaction of all obligations due to STOCKHOLDERS from [the Firm] and BUYERS pursuant to the provisions hereof and the Acquisition Agreement, as amended, dated September 18, 1987, and the collateral documents executed in conjunction therewith, BUYERS shall be entitled to terminate the consulting relationship set forth in this agreement and, upon such termination, all other agreements between the parties shall likewise be deemed to have been fully satisfied, completed and terminated.

The Restrictive Covenant Agreement placed limitations on the Stockholders' right to practice public accounting following the closing. It provided that the Stockholders would only engage in public accounting for the Firm "pursuant to the terms of [the] Consulting Agreement." The Restrictive

5

Covenant Agreement also placed three limitations on the Stockholders. It provided that they (1) would not practice public accounting in competition with the Firm; (2) would not solicit the Firm's clients to leave the Firm; and (3) would not assist or join with any individual or business entity to compete with the Firm or to solicit clients from the Firm. The Agreement also carved out services that were exempt from restriction, allowing the Stockholders to offer their services apart from the Firm with respect to the acquisition or disposition of real estate or financial planning.

As consideration for the restrictive covenant, the Firm agreed to pay each stockholder a sum of money "in accordance with the payment provision set forth in paragraph 8 of" the Acquisition Agreement. The Restrictive Covenant Agreement stated that Shapiro would be paid $890,211.93, which under paragraph 5 of the Acquisition Agreement was seventy-five percent of Shapiro's payment for the acquisition of his interest in the Firm and the restrictive covenant. In addition, the Restrictive Covenant Agreement stated that the Stockholders were agreeing to those restrictions because they were "vital to the accomplishment of the purposes of all agreements of the parties."

On August 1, 1996, the Stockholders and Buyers entered a "Third Amendment to the Acquisition Agreement" (Third Agreement). Under that

A-3506-19

Agreement, Shapiro agreed to continue to act as a consultant to the Firm for five years "following the end of the present agreements." The Third Agreement also provided a new formula for how Shapiro would be compensated for his consulting services.

It is undisputed that all payments due to Shapiro and the other Stockholders under the Acquisition Agreement, Consulting Agreement, and Restrictive Covenant Agreement were paid by 1999. Accordingly, Shapiro then acted as a consultant to the Firm under the Third Agreement for five years, from 1999 to 2004. It is also undisputed that the Firm did not enter into a new or extended consulting agreement with Shapiro after 2004. Instead, after 2004, Shapiro worked as an employee of the Firm without a governing contract, and he was paid a salary.

On April 30, 2019, at the age of seventy-nine, Shapiro resigned from the Firm. Thereafter, he joined another accounting firm that competes with the Firm and he began to solicit clients of the Firm to work with him and his new firm.

In September 2019, the Firm sued Shapiro, seeking to enjoin him from competing with the Firm under the Restrictive Covenant Agreement or, alternatively, to obtain money damages. Following discovery, Shapiro moved for summary judgment, arguing that the Restrictive Covenant Agreement had

7

terminated and no longer bound him. The Firm cross-moved for summary judgment in its favor.

The trial court heard oral arguments on April 24, 2020. That same day, the court entered an order granting summary judgment to Shapiro and denying summary judgment to the Firm. The trial court also ruled: "[T]here is no enforceable restrictive covenant or lifetime prohibition against [d]efendant, Steven L. Shapiro, concerning his prior employment with [p]laintiff's firm."

In its oral decision, set forth on the record on April 24, 2020, the trial court reasoned that under paragraph 10 of the Consulting Agreement, all three agreements – the Acquisition Agreement, the Consulting Agreement, and the Restrictive Covenant Agreement – terminated in 2004, when all the Firm's and Buyers' obligations to Shapiro were satisfied and Shapiro ceased to act as a consultant to the Firm.

II.

The Firm appeals and makes two arguments, contending that the trial court erred in (1) determining that the Restrictive Covenant Agreement had terminated; and (2) not blue penciling the restrictive covenant to give it a two-year duration following Shapiro's resignation from the Firm in 2019. We reject both those arguments.

A-3506-19

## A.

We review the grant of summary judgment de novo, using "the same standard that govern[ed] the motion judge's determination." Caraballo v. City of Jersey City Police Dep't, 237 N.J. 255, 264 (2019) (citing RSI Bank v. Providence Mut. Fire Ins. Co., 234 N.J. 459, 472 (2018)). We will uphold a grant of summary judgment if "the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact challenged and that the moving party is entitled to a judgment or order as a matter of law." Ibid. (quoting RSI Bank, 234 N.J. at 472); accord Brill v. Guardian Life Ins. Co. of Am., 142 N.J. 520, 523 (1995).

The controlling issue on this appeal is a question of law involving the interpretation of the Restrictive Covenant Agreement and its relationship to the Acquisition Agreement, the Consulting Agreement, and the Third Agreement. Our standard of review of that legal issue is plenary. Barr v. Barr, 418 N.J. Super. 18, 31 (App. Div. 2011).

## B.

Restrictive covenants are enforceable under New Jersey law, provided they are reasonable. See Solari Indus., Inc. v. Malady, 55 N.J. 571, 585 (1970);

9

see also Whitmyer Bros., Inc. v. Doyle, 58 N.J. 25, 35 (1971); Maw v. Advanced Clinical Commc'ns, Inc., 179 N.J. 439, 447 (2004).  Our Supreme Court has developed a test, known as the Solari/Whitmyer test, to determine if a restrictive covenant is reasonable.  An agreement is reasonable under that test if it:  (1) protects legitimate interests of the party seeking to enforce the covenant; (2) does not impose an undue hardship on the party to be restricted; and (3) is not injurious to the public.  Maw, 179 N.J. at 447.  "Courts will not[, however,] enforce a restrictive agreement merely to" prevent competition.  Ingersoll-Rand Co. v. Ciavatta, 110 N.J. 609, 635 (1988).

When a non-compete agreement is "ancillary to the purchase of a business" it is "accorded far more latitude" than a restrictive covenant ancillary to an employment agreement.  Coskey's Television & Radio Sales & Serv., Inc. v. Foti, 253 N.J. Super. 626, 633 (App. Div. 1992).  Nevertheless, the same three-part test applies to both types of restrictive covenants.  See Graziano v. Grant, 326 N.J. Super. 328, 344-45 (App. Div. 1999) (applying the same three-prong Solari/Whitmyer test to determine whether a restrictive covenant ancillary to the sale of a medical practice was enforceable).

If a restrictive covenant is found to be enforceable, its scope can be limited concerning the duration of its restriction and the geographic area it covers.

10

Coskey's, 253 N.J. Super. at 634 (citing Solari, 55 N.J. at 585). The judicial refinement of a restrictive covenant is known as "blue penciling." Ibid.

The Restrictive Covenant Agreement signed by Shapiro may have been enforceable, but it would have needed to be limited. The Firm had a legitimate interest in reasonably protecting its purchase of the stock from Shapiro and the other two Stockholders. The restriction did not impose an undue hardship on Shapiro because it allowed him to continue to consult with the Firm. Nevertheless, the covenant would have needed to be limited in duration and in geographic scope. If so limited, the covenant may not have been injurious to the public since it would not have extinguished competition; rather it would have reasonably protected the Buyers' investment in purchasing the Firm. Concluding that the restrictive covenant may have been enforceable, however, does not end the inquiry. We must also interpret and construe the Restrictive Covenant Agreement's duration.

## C.

In interpreting a contract, we look to the plain language of the agreement. McMahon v. City of Newark, 195 N.J. 526, 545-46 (2008). When the terms of the contract are clear and unambiguous, courts enforce the terms as written and do not "make a better contract for either of the parties." Ibid.; Pacifico v.

Pacifico, 190 N.J. 258, 266 (2007); Watson v. City of E. Orange, 175 N.J. 442, 447 (2003) (Long, J., dissenting). Moreover, when several writings are produced as part of the same transaction, they can be read together. Shelter Sys. Grp. Corp. v. Lanni Builders, Inc., 263 N.J. Super. 373, 376 (App. Div. 1993) (citing Gen. Elec. Credit Corp. v. Castiglione, 142 N.J. Super. 90, 101 (Law Div. 1976)).

A plain reading of the language of the Restrictive Covenant Agreement makes it clear that it had the same duration as the Acquisition Agreement, the Consulting Agreement, and the Third Agreement. The Restrictive Covenant Agreement was entered into in connection with the sale of the stock to the Buyers. Importantly, the consideration for the Restrictive Covenant Agreement was seventy-five percent of the value of what the Buyers agreed to pay in the Acquisition Agreement.

Moreover, the Consulting Agreement and Third Agreement are clear in stating that they would last for as long as the Buyers are paying the acquisition costs and one or more of the Stockholders are acting as a consultant to the Firm. In that regard, the payment under the Restrictive Covenant Agreement was to be "paid to Stockholders in accordance with the payment provision set forth in paragraph 8 of" the Acquisition Agreement.

A-3506-19

The Restrictive Covenant Agreement also expressly stated that the Stockholders' covenants were made pursuant to the Consulting Agreement. The Consulting Agreement provided that it terminated when the Buyers completely satisfied their obligations to the Stockholders under the Acquisition Agreement. The Consulting Agreement also provided that "all other agreements between the parties shall likewise be deemed to have been fully satisfied, completed and terminated" when the Stockholders had received all their payments.

The Third Agreement extended Shapiro's consulting relationship with the Firm for five years, from 1999 to 2004. It is undisputed that Shapiro ceased acting as a consultant to the Firm after 2004. Instead, from 2005 until April 2019, Shapiro acted as an employee of the Firm with no governing contract. In summary, reading the agreements in relation to each other, the Restrictive Covenant Agreement ended when Shapiro ceased to act as a consultant to the Firm.

That construction is reasonable since it gave the Firm fifteen years of protection from the time that the parties closed on the Acquisition Agreement. In that regard, it gave the Firm five years of protection after the Firm had paid all the acquisition costs, during which time Shapiro continued to act as its consultant.

13

The Firm argues that the Restrictive Covenant Agreement did not have an express duration and it was without geographic limitation. While the Restrictive Covenant Agreement was clearly without geographic limitation, for the reasons already explained we reject the contention that it did not have a time limitation. The plain language of the Acquisition Agreement, Consulting Agreement, Restrictive Covenant Agreement, and Third Agreement made it clear that all those agreements would cease to operate when the final payments for the acquisition were made and Shapiro was no longer acting as a consultant to the Firm. Indeed, to read it otherwise would make the Restrictive Covenant Agreement unenforceable because, after 2004, it would be merely preventing competition without a time limitation. See ADP, LLC v. Kusins, 460 N.J. Super. 368, 400 (App. Div. 2019) (noting that a restrictive covenant must be "reasonable in duration" to be enforceable).

The Firm points out that paragraph 10 of the Consulting Agreement gives it the right to terminate the relationship with Shapiro and does not say that the consulting relationship will end. We acknowledge that point. Nevertheless, the Consulting Agreement is clear in providing that "upon such termination [of the consulting relationship,] all other agreements between the parties shall likewise be deemed to have been fully satisfied, completed and terminated." Moreover,

the Third Agreement had an express five-year term that ended in 2004. The material undisputed fact is that the Firm ended the consulting relationship with Shapiro in 2004. Consequently, after 2004, all agreements between the Firm and Shapiro were "fully satisfied, completed and terminated."

Finally, we reject the Firm's contention that the Restrictive Covenant Agreement should be blue penciled. Because the agreements had a clear termination event – the ending of the consulting relationship – it would be rewriting the agreement to add a different termination date. Moreover, even if we were to conclude that the blue penciling of this restrictive covenant would be appropriate, the only reasonable thing to do would be to revise it so that it had a termination date two years beyond the end of the consulting relationship. In other words, blue penciling would have the Restrictive Covenant Agreement end in 2006.

In summary, we agree with the trial court that the Restrictive Covenant Agreement had terminated, and it was no longer enforceable in 2019 when Shapiro left the Firm.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION