NOT PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No: 22-1547
_____

GLENN ARTERBRIDGE,
Appellant

v.

WAYFAIR LLC
_____

On Appeal from the United States District Court
For the District of New Jersey
(D.C. No. 1-21-cv-13306)
District Judge: Honorable Christine P. O'Hearn
_____

Submitted Under Third Circuit L.A.R. 34.1(a)
April 27, 2023

Before: JORDAN, KRAUSE and BIBAS, *Circuit Judges*

(Filed May 4, 2023)
_____

OPINION[*]
_____

---

[*] This disposition is not an opinion of the full court and, pursuant to I.O.P. 5.7, does not constitute binding precedent.

JORDAN, *Circuit Judge*.

Glenn Arterbridge contends that his termination for coming to work while awaiting the results of a COVID-19 test flouted the public policy embodied in recommendations by the Centers for Disease Control and Prevention ("CDC") and the New Jersey Governor and, so, violated New Jersey's Conscientious Employee Protection Act and New Jersey common law. The District Court dismissed his claims, concluding that the recommendations cited by Arterbridge did not have the requisite clarity as public policy to support his claims. We agree and will affirm.

## I.    BACKGROUND[1]

Arterbridge worked as a Desktop Support Engineer in one of Wayfair's New Jersey warehouse locations from February 2019 until his termination in July 2020. In March 2020, the New Jersey Governor declared a Public Health Emergency and State of Emergency due to the COVID-19 pandemic, resulting in, among other things, the closure of many businesses and the cessation of in-person learning in schools.[2] As a result of the

---

[1] We draw the factual background from Arterbridge's complaint, as we must. *See infra* at note 7. Wayfair says that Arterbridge's allegations quote text from the CDC website as it was updated months after his termination. Wayfair proffers a different version of the CDC website that it contends was in place when Arterbridge was terminated in July 2020. Arterbridge ignores that charge in his reply. In any event, Wayfair argues that Arterbridge's claims fail even under his preferred version of the guidance. We agree, and, accordingly, proceed with the version quoted in Arterbridge's complaint.

[2] Although the complaint does not cite the specific orders to which it alludes, the New Jersey Governor's Executive Orders 103, 104, and 107 did, indeed, impose such limitations. *See* N.J. Exec. Order 103 (Mar. 9, 2020), https://nj.gov/infobank/eo/056murphy/pdf/EO-103.pdf (declaring such emergencies) (last visited Apr. 7, 2023); N.J. Exec. Order 104 (Mar. 16, 2020),

pandemic-related school closures, Arterbridge took a leave of absence from work to care for his children.  Afterward, he resumed working at the warehouse, as he was deemed an "essential worker."

During the course of the pandemic, both the CDC and Governor Murphy provided guidance, generally seeking to curb the pandemic's spread.  The guidance included suggestions on the use of both diagnostic and screening testing for COVID-19.[3]  As relevant here, the CDC suggested that screening testing be implemented on a weekly basis by businesses in places with high rates of community transmission.[4]  The rationale for that was that persons with COVID-19 who were either asymptomatic or presymptomatic were "significant contributors" to the spread of the virus.  (App. at 004.)

---

https://nj.gov/infobank/eo/056murphy/pdf/EO-104.pdf (imposing various limitations, including on businesses and in-person learning) (last visited Apr. 7, 2023); N.J. Exec. Order 107 (Mar. 21, 2020), https://nj.gov/infobank/eo/056murphy/pdf/EO-107.pdf (superseding Exec. Order No. 104 and imposing various limitations, including on businesses and in-person learning) (last visited Apr. 7, 2023).  We take judicial notice of such executive orders under Rule 201 of the Federal Rules of Evidence.  *See Clark v. Governor of N.J.*, 53 F.4th 769, 772 n.5 (3d Cir. 2022) (taking judicial notice of such orders).

[3] According to the CDC, "Diagnostic testing" seeks to "identify current infection in individuals and is performed when the person has signs or symptoms consistent with COVID-19, or when a person is asymptomatic, but has recent known or suspected exposure."  (App. at 19-20 ¶ 14.)  "Screening tests," on the other hand, seeks to "identify infected people who are asymptomatic and do not have known, suspected, or reported exposure" to the virus.  (*Id.*)

[4] In the month of his termination, July 2020, both the location of Arterbridge's workplace, and New Jersey as a whole, were experiencing high rates of transmission.

3

Similarly, in two public briefings in July 2020, Governor Murphy echoed the recommendations for testing, including for those who were asymptomatic.

Wayfair did not implement mandatory screening testing. Instead, if a Wayfair employee chose to take a COVID-19 test, that employee was barred from coming to work until the test results came back, regardless of whether the employee was experiencing symptoms. Arterbridge alleges that, at the time of his termination, Wayfair did not provide paid leave for employees awaiting test results.[5]

In mid-July 2020, Arterbridge chose to get a screening test for COVID-19 but continued going to work while awaiting his results. Ultimately, Arterbridge learned that he had tested positive, and he so informed Wayfair. Wayfair subsequently fired Arterbridge for violating its policy.

In May 2021, Arterbridge filed this lawsuit in the Superior Court of New Jersey, Camden County challenging his termination. The complaint contained two counts: violation of New Jersey's Conscientious Employee Protection Act ("CEPA") and a wrongful termination claim under *Pierce v. Ortho Pharm. Corp.*, 417 A.2d 505 (N.J.

---

[5] Wayfair submitted two exhibits to support its contention that employees, like Arterbridge, were provided paid leave while they awaited their COVID-19 test results. The District Court declined to consider those exhibits, concluding they were not necessary to decide the motion to dismiss. For purposes of this appeal, we likewise do not consider them.

1980).[6] Wayfair removed the case to the District Court and then moved to dismiss both counts.

The District Court granted Wayfair's motion to dismiss and closed the case. It concluded that the CDC's recommendations regarding screening testing and Governor Murphy's encouragement of the same did not constitute the "clear mandate of public policy" required for CEPA and *Pierce* claims. *See* N.J. Stat. Ann. § 34:19-3(c)(3) (prohibiting, in pertinent part, an employer from retaliating "against an employee" for "[o]bject[ing] to, or refus[ing] to participate in any … policy … the employee reasonably believes … is incompatible with a clear mandate of public policy concerning the public health, safety or welfare"); *see also Pierce*, 417 A.2d at 512 (recognizing "an employee has a cause of action for wrongful discharge when the discharge is contrary to a clear mandate of public policy"). Thus, even assuming Arterbridge would not have received paid leave while his results were pending, the District Court determined that both claims failed.

This timely appeal followed.

II.  **DISCUSSION**[7]

"[F]or purposes of both *Pierce* and CEPA claims, the determination whether the plaintiff adequately has established the existence of a clear mandate of public policy is an

---

[6] Though not called by this name in the complaint, this claim is commonly referred to as a *Pierce* claim, and the parties and District Court either refer to it as such or identify its origin.

[7] The District Court had diversity jurisdiction under 28 U.S.C. §§ 1332 and 1441. We have jurisdiction pursuant to 28 U.S.C. § 1291. We review de novo the District

issue of law" that is to be decided by a court. *Mehlman v. Mobil Oil Corp.*, 707 A.2d 1000, 1012 (N.J. 1998). Arterbridge contends that the District Court erred in concluding that the recommendations by the CDC and Governor Murphy encouraging screening testing were insufficient to constitute a "clear mandate of public policy" for the purposes of his CEPA and *Pierce* claims. We disagree and will address each claim in turn.

### A. Conscientious Employee Protection Act Claim

As relevant here, CEPA bars an employer from retaliating "against an employee" for "[o]bject[ing] to, or refus[ing] to" abide by a "policy" of his employer, "which the employee reasonably believes ... is incompatible with a clear mandate of public policy concerning the public health, safety or welfare[.]" N.J. Stat. Ann. § 34:19-3(c)(3). The first element of such a claim is whether the employee "reasonably believed that his or her employer's conduct was violating either a law, rule, or regulation promulgated pursuant to law, or a clear mandate of public policy."[8] *Dzwonar v. McDevitt*, 828 A.2d 893, 900 (N.J. 2003). "Accordingly, it is not the [employee]'s burden to show that the [employer]

---

Court's dismissal for failure to state a claim. *LabMD Inc. v. Boback*, 47 F.4th 164, 178 n.7 (3d Cir. 2022). In doing so, "we accept the factual allegations in the complaint as true, draw all reasonable inferences in favor of the plaintiff, and assess whether the complaint and the exhibits attached to it 'contain enough facts to state a claim to relief that is plausible on its face.'" *Watters v. Bd. of Sch. Directors of City of Scranton*, 975 F.3d 406, 412 (3d Cir. 2020) (quoting *Vorchheimer v. Philadelphian Owners Ass'n*, 903 F.3d 100, 105 (3d Cir. 2018)).

[8] The remaining elements are: second, whether the employee "performed a 'whistle-blowing' activity ….; [third, whether] an adverse employment action was taken against [the employee]; and[,] [fourth, whether] a causal connection exists between the whistle-blowing activity and the adverse employment action." *Dzwonar v. McDevitt*, 828 A.2d 893, 900 (N.J. 2003).

actually violated the law, rule, regulation, or other authority cited, but only to demonstrate that [the employee] held a reasonable belief that such a violation occurred." *Hitesman v. Bridgeway, Inc.*, 93 A.3d 306, 318 (N.J. 2014). That showing requires that the employee demonstrate "a substantial nexus between the [employer's] complained-of conduct and a 'clear mandate of public policy[.]'" *Id*. at 319.

Thus, it is incumbent upon the employee to demonstrate the existence of a "clear mandate of public policy" that bears on the employer's challenged conduct. *See id.* at 322 (holding that such a claim fails as a matter of law without such a showing). "A 'clear mandate' of public policy suggests an analog to a constitutional provision, statute, and rule or regulation *promulgated pursuant to law* such that … there should be a high degree of public certitude in respect of acceptable versus unacceptable conduct." *Maw v. Advanced Clinical Commc'ns, Inc.*, 846 A.2d 604, 607 (N.J. 2004) (emphasis in original). New Jersey "courts have recognized various sources of authority bearing the required substantial nexus to the plaintiff's claim[,] [but] [i]n each case, the law, regulation, or other authority held to support a CEPA claim, not only expressed a 'clear mandate of public policy,' but identified acceptable and unacceptable practices in the defendant employer's business." *Hitesman*, 93 A.3d at 321. Arterbridge has not identified any "statute, regulation or rule that closely relates to the complained-of conduct" (App. at 009), so he must demonstrate the existence of a "clear mandate of public policy" under the foregoing standard.

Like the District Court, we assume that recommendations from the CDC and Governor Murphy may, in some cases, embody a "clear mandate of public policy." But

7

the recommendations cited by Arterbridge simply do not fill the bill. As the District Court correctly observed, "nothing in the guidance documents cited by Plaintiff requires businesses to adopt any particular testing protocol or to pay employees who are required to stay at home pending test results."[9] (App. at 009-10.) "[T]he CDC provided employers with 'strategies to *consider* for incorporating testing … into workplace preparedness, response, and control plans in non-healthcare workplaces.'" (App. at 010 (quoting CDC, *Testing in Non-Healthcare Workplaces* (2021) (emphasis added)).) This does not satisfy the textual "requirement of a 'mandate' as opposed to a less rigorous standard for the type of public policy that is implicated." *Maw*, 846 A.2d at 607. And it does not "provide a definite standard by which the employer's conduct may be gauged[,]" demarcating "unacceptable practices in the defendant employer's business." *Hitesman*, 93 A.3d at 320-21.

Further, the requirement of "a 'clear' mandate of public policy bespeaks a desire not to have CEPA actions devolve into arguments between employees and employers over what is, and is not, correct public policy." *Maw*, 846 A.2d at 607. As the District Court correctly observed, the CDC guidance did not purport to require business to have their "asymptomatic workers to get tested," let alone "speak at all" to the question of "paid leave [to encourage workers] to do so." (App. at 010.) It is not our role to convert

---

[9] The website cited by the District Court is no longer available. As mentioned earlier, *supra* note 1, Wayfair has proffered the version of the guidance it contends that Arterbridge cited in his complaint. Arterbridge does not dispute that Wayfair correctly identified the version upon which he relied.

Arterbridge's policy preferences into a legally enforceable obligation after the fact – even if arguably consistent with non-mandatory suggestions of public officials – or to express an opinion on whether those preferences are superior to the policy Wayfair chose.

### B.     *Pierce* **Claim**

Turning to Arterbridge's *Pierce* claim, the New Jersey Supreme Court has held "that an employee has a cause of action for wrongful discharge when the discharge is contrary to a clear mandate of public policy." *Pierce v. Ortho Pharm. Corp.*, 417 A.2d 505, 512 (N.J. 1980). "In large measure, the [CEPA] and [*Pierce*] causes of action are similar," *Tartaglia v. UBS PaineWebber Inc.*, 961 A.2d 1167, 1181 (N.J. 2008), because "CEPA elaborates on and derives from the common law cause of action for wrongful discharge this Court first recognized in [*Pierce*]," *Mehlman*, 707 A.2d at 1008. One key difference is that *Pierce* claims require an actual violation of the "clear mandate of public policy," while CEPA requires a reasonable belief of such a violation. *Id.* at 1008, 1015. But the existence of a "clear mandate of public policy" is essential to both claims. *See Leang v. Jersey City Bd. of Educ.*, 969 A.2d 1097, 1108 n.7 (N.J. 2009) (discussing the requirement for a *Pierce* claim); *Hitesman*, 93 A.3d at 318 (discussing the requirement for the analogous CEPA claim).

CEPA takes the phrase "clear mandate of public policy" verbatim from *Pierce*. *See Tartaglia*, 961 A.2d at 1181 (comparing the text of CEPA, N.J. Stat. Ann. § 34:19-3(c), with *Pierce*). Thus, we agree with the District Court that Arterbridge's *Pierce* claim fails for the same reason as does his CEPA claim: failure to demonstrate the existence of a "clear mandate of public policy."

**III.  CONCLUSION**

For the foregoing reasons, we will affirm the District Court's dismissal of both of Arterbridge's claims.