**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. <u>R.</u> 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-5034-15T1

KING TRANSCRIPTION
SERVICES, LLC,

     Plaintiff-Appellant/
     Cross-Respondent,

v.

PHOENIX TRANSCRIPTION, LLC,
TERESA ULRICH, MELISSA
ULRICH, JOHN ULRICH, MARK
MAZZA and PATRICIA WTULICH,

     Defendants-Respondents,

and

FRANK ULRICH,

     Defendant/Third-Party
     Plaintiff-Respondent/
     Cross-Appellant,

v.

CARL NEILSEN and GARY
FROONJIAN,

Third-Party Defendants-
Respondents.

_____

Argued January 24, 2018 – Decided March 19, 2019

Before Judges Nugent, Currier and Geiger.

On appeal from Superior Court of New Jersey, Law Division, Morris County, Docket No. L-1058-15.

Peter J. Herrigel argued the cause for appellant/cross-respondent (Herrigel & Herrigel, LLC, attorneys; Peter J. Herrigel, on the brief).

John A. Fialcowitz argued the cause for respondents Phoenix Transcription, LLC, Teresa Ulrich, Melissa Ulrich, John Ulrich, Mark Mazza and Patricia Wtulich.

Jeffrey D. Ullman argued the cause for respondent/ cross-appellant (Ullman, Furhman & Platt, PC, attorneys; Jeffrey D. Ullman, on the brief).

PER CURIAM

This is an action by plaintiff, King Transcription Services, LLC (King), on a restrictive covenant. King alleged its former employee and member, defendant Frank Ulrich, breached the restrictive covenant by organizing and obtaining work for a competitor, defendant Phoenix Transcription, LLC (Phoenix). King appeals from the summary judgment dismissal of its claims against all defendants except Frank Ulrich, and from the order that sanctioned

King for filing frivolous claims against three dismissed defendants.  King also appeals from the final judgment entered in its favor, arguing the court unduly restricted its damage claim and erroneously declined to enforce prospectively the restrictive covenant as to Frank Ulrich.

Defendant, Frank Ulrich, cross-appeals from the final judgment.  He contends the restrictive covenant was unlawful, King's damage claim was unsupported by competent evidence, and the trial court should not have dismissed his counterclaim.

Because King demonstrated the existence of genuinely disputed material facts from which a jury could have inferred that defendant John Ulrich — and thereby Phoenix as well — aided and abetted Frank Ulrich's activities in breaching the restrictive covenant and tortiously interfering with King's prospective economic advantage, we reverse the summary judgment as to John Ulrich and Phoenix.  Because the order sanctioning King for filing frivolous claims included its claims against John Ulrich, we vacate that order and remand for reconsideration of the assessment of attorney's fees for filing frivolous claims.  We otherwise affirm the order of summary judgment and the final judgment against Frank Ulrich.

A-5034-15T1

## I.

## A.

King commenced this action in September 2013 by filing an order to show cause and verified complaint in the Chancery Division. King sought to restrain Frank Ulrich, its former employee and member, from breaching the restrictive covenant in King's Operating Agreement. The court denied King injunctive relief. The next month, King filed an eight-count amended complaint.

The amended complaint's first count alleged Frank Ulrich violated the restrictive covenant in King's Operating Agreement, and the other defendants "participated in, aided and abetted and facilitated Frank Ulrich's breach of his duties under [King's] Operating Agreement." The second and fourth counts alleged Frank Ulrich usurped a corporate opportunity and breached the covenant of good faith implied in King's Operating Agreement. The third and fifth counts alleged Frank Ulrich, Teresa Ulrich, and Melissa Ulrich breached their fiduciary duties of loyalty to King and misappropriated King's trade secrets. The sixth count alleged Phoenix tortiously interfered with King's business relations, and the seventh and eight counts alleged all defendants misappropriated King's assets and engaged in unfair competition.

A-5034-15T1

Defendants filed answers and Frank Ulrich filed a counterclaim and third-party complaint against King and its two other members, Carl Nielsen and Gary Froonjian. In his seven-count pleading, Frank Ulrich alleged in the first count he was an oppressed minority owner of King. In the second and third counts, he alleged King's other owners breached their fiduciary duties to him and breached the terms of the Operating Agreement. In the fourth count he sought an accounting. In the fifth count, Ulrich alleged the other owners had conspired to interfere with his prospective economic advantage, terminate his employment, and deprive him of his livelihood. In the sixth and seven counts, he claimed Nielsen and Froonjian defamed him and damaged his reputation.

Four months after King filed its amended complaint, defendants Mark Mazza, John Ulrich, and Patricia Wtulich wrote to King and demanded it dismiss with prejudice its claims against them or risk frivolous claim sanctions authorized by Rule 1:4-8 and N.J.S.A. 2A:15-59.1. King agreed to dismiss its claim against Mazza without prejudice but refused to dismiss the claim with prejudice. King refused to dismiss its claims against John Ulrich and Patricia Wtulich.

Following the exchange of discovery, the court dismissed on summary judgment the complaint against all defendants except Frank Ulrich; count five

5

of the complaint against Frank Ulrich; and count three of Ulrich's counterclaim and third-party complaint. Thereafter, the dismissed defendants moved for attorney's fees and costs, arguing King's claims were frivolous. The court granted the motion in part and awarded Phoenix attorney's fees and litigation costs it incurred defending John Ulrich, Patricia Wtulich, and Mark Mazza "from King's frivolous claims." The Appellate Division denied King's motions for leave to appeal and to stay the fee award.

In April 2015, having disposed of the parties' equitable claims, the Chancery Division judge transferred the case to the Law Division. There, following a bench trial, the court entered judgment for King against Frank Ulrich for $273,642.40, comprised of "$180,630.54 in compensatory damages and $93,011.86 for fees and costs." The appeal and cross-appeal followed.

B.

King developed the following proofs at trial. Defendant, Frank Ulrich, formed King with Carl Nielsen in September 2003. King's business was providing transcription services, mostly to municipal courts and the Superior Court. In January 2006, Ulrich and Nielsen admitted Gary Froonjian as a third member of the company. Each member had a 33.3% ownership interest in King. The three members signed a January 21, 2006 Operating Agreement, which

6

included the following terms (collectively referred to as the restrictive covenant):

> Not to carry on similar business. As long as a Member is a Member or Employee of the Company, and also for a period of two (2) years after termination of employment or termination of membership interest, Member will not directly or indirectly own, manage, be employed by, engage in, carry on, or be connected in any other matter with any legal court transcription business, transcribing court proceedings from Bergen, Essex, Hudson, Passaic and Morris counties of the State of New Jersey or any other county which is a client of King Transcription, LLC, or any other business similar to the type of business conducted by the Corporation at that time.

> No Disclosure of Customers or Suppliers. Member will not at any time, either during employment or ownership of membership interest or after termination, directly or indirectly make known or divulge to any person, firm, or corporation the names or addresses or any other information as to any of the customers, advertisers, vendors or suppliers of the Company. The Employee/Member agrees that this is confidential information which is owned solely by the Company.

> Not to Solicit Customers, Suppliers or Advertisers. Employee/Member will not, during the period of one [(sic)] (2) years after termination of employment or membership interest, directly or indirectly, either for himself or for any other person, firm, or corporation, call upon, compete for, solicit, divert, or take away, or attempt to divert or take away, any of the customers, suppliers, or advertisers of the Company.

Not to Disclose Information.  Employee/Member will not at any time, in any fashion, form, or manner, either directly or indirectly, divulge, disclose, or communicate to any person, firm, or corporation, in any manner whatsoever, any information of any kind, nature, or description concerning any matters affecting or relating to the business of the Company, including, but not limited to, the names of any of its customers or prospective customers or any other information concerning the business of the Company, its manner of operation, its plans, its vendors, its suppliers, its advertising, its marketing, its methods, its practices, its sales figures, product formula, manufacturing plans, or any other information of any kind, nature, or description without regard to whether any or all of the foregoing matters would otherwise be deemed confidential, material, or important.

Records Belong to Company.  All books, records, files, forms, samples, reports, account[s], papers and documents relating in any manner to the Company's business, vendors, suppliers or customers, whether prepared by Employee/Member or anyone else, are the exclusive property of the Company and shall be returned immediately to the Company upon termination of employment or membership interest.

Breach.  The parties hereby agree that each of the foregoing matters is important, material, and confidential, and gravely affect the effective and successful conduct of the business of the Company and affect its reputation and goodwill.  Any breach of the terms of this Agreement is a material breach of this Agreement, from which Employee/Member may be enjoined and for which the Employee/Member shall also pay to the Company all damages (including but not limited to compensatory, incidental, consequential and

A-5034-15T1

lost profits damages), which arise from the breach, together with interest, costs and the Company's reasonable attorneys fees (through appeal) to enforce this Agreement. Any lawsuit for breach may be brought in Passaic County, New Jersey, which shall be a proper venue.

King provided transcription services — preparing official transcripts from recorded proceedings — to the Superior Court in various counties, including Bergen, Essex, Hudson, Middlesex, Morris, and Passaic. According to Neilsen and Froonjian, the business depended on two things: the volume of work King received from the court transcription clerks and how efficiently transcribers could produce transcripts from the recordings. However, King presented no undisputed evidence, based on firsthand knowledge, as to how court transcription clerks assigned work. For example, King did not present testimony from any clerk who assigned the work, nor did King present evidence of any administrative directives concerning how the work was to be assigned.

Neilson intimated the court transcription clerks had the discretion to send work to some transcription companies and not others. Froonjian said each county assigned work in a different manner. Some, for example, assigned work only to transcription companies in their county. John Ulrich testified the work

9

was distributed on a rotational basis. Frank Ulrich also maintained work was distributed on a rotational basis.

Despite the conflicting testimony about how transcription clerks assigned work, the parties agreed it was crucial to maintain relationships with the court transcription clerks. Froonjian testified it was important to learn their likes and dislikes, how to be social with them, what they were about, what made them tick. Frank Ulrich, who ran King's daily operations, was the King member who cultivated relationships with the transcription clerks, particularly those in Essex and Bergen Counties.

To cultivate such relationships, Frank Ulrich would take the clerks in the Bergen County transcription unit to lunch. He gave two clerks and their children tickets to the circus. He invited the clerks and their children to his home for barbecues and he knew their personal cellular phone numbers. Ulrich cultivated similar relationships with some of the transcription clerks in Essex County. Although he claimed his social activities with the Bergen County transcription clerks were based on his friendships with them and had nothing to do with work, he also testified King partially reimbursed him for tickets to New Jersey Devils games because he was "using a percentage to . . . take customers to the Devils games." In any event, the parties did not dispute that Frank Ulrich's relationship

with transcription clerks was crucial to getting work. According to Nielsen, at some point King's revenues grew to more than a million dollars annually.

Nielsen and Froonjian also stressed the need for transcribers who could routinely and expeditiously produce quality work. Once certified by the State, transcribers could have their names placed on a court website, but nothing required them to do so. They could present their certification to an approved transcription company and transcribe for that company. According to Froonjian, none of those who transcribed for King placed their name on the court website while Frank Ulrich was a King employee.

Nonetheless, the transcribers were not King employees. They were not obligated to transcribe solely for King or any other company. Rather, according to Frank Ulrich, "[t]hey could pick up and walk any time they wanted to." Most worked at home. Some lived in other states. Most received and returned work by email.

Froonjian testified that a transcriber's value depended on many variables, including whether the transcriber was available to do "daily copy, expedited work, or standard work." King's knowledge of which transcribers were willing to do these tasks, which transcribers could turn the work around expeditiously, and which transcribers could consistently produce quality work was knowledge

11

Froonjian wanted to keep confidential. Such knowledge was, according to Froonjian, one of the things that made King a "giant" in the "daily transcript business." Froonjian also wanted to keep confidential the rates King paid transcribers. If a King competitor learned the rate per page King paid transcribers, the competitor could increase that rate and start a bidding war, which King wanted to avoid.

King had developed or refined tracking software, KTS, and accounting software, AccountEdge, that included detailed information about the source of King's work, categories of revenue, and information about transcribers. One purpose of the confidentiality provisions in King's Operating Agreement was the protection of such information.

Six years after Froonjian became a member of King, he and Nielsen had a falling out with Frank Ulrich. They discovered Ulrich was using company funds to pay for personal expenses. In addition, Ulrich refused to provide a copy of his income tax return so the company could obtain a business loan. Froonjian and Nielsen terminated Frank Ulrich's employment with King in November 2012, but Ulrich remained a member with an ownership interest. King included Frank Ulrich in the next two distributions to its members but made adjustments to recoup the personal expenses Ulrich had paid from King's revenue.

A-5034-15T1

In February 2013, three months after his termination as a King employee, Frank Ulrich demanded to be bought out. Froonjian and Nielsen tentatively agreed to a buyout, but they were unwilling to consummate the buyout until Ulrich resolved a $151,510.17 Internal Revenue Service lien. In June 2013, King stopped paying distributions to Frank Ulrich for two reasons: first, the IRS lien remained unresolved; and second, Froonjian and Nielsen learned that a new transcription company — Phoenix — had been formed and was doing court transcription work. They believed Frank Ulrich was involved with Phoenix in violation of the restrictive covenant in King's Operating Agreement. Thus, as of June 2013, Frank Ulrich was neither an employee nor a participating member of King.

Phoenix filed its Certificate of Formation on March 1, 2013. Frank Ulrich's brother, defendant John Ulrich, formed Phoenix. John's wife, defendant Teresa Ulrich, ran Phoenix's daily operations. Her brother, Mark Mazza, was named as Phoenix's registered agent when Phoenix was formed, though he was neither an owner nor an employee of Phoenix. In August 2013, five months after Phoenix's formation, Mazza asked to be removed as registered agent.

During the trial, to prove Frank Ulrich's involvement with Phoenix, King called Teresa, John, and Frank Ulrich as witnesses. King also presented the testimony of two transcribers who worked for King. One transcriber testified that in July 2013, during a telephone conversation with Patricia Wtulich, who had once transcribed for King, Patricia said she had left King and was going to work for Frank Ulrich and his brother. The other testified in a de bene esse deposition that in July 2013, Frank Ulrich telephoned her to see if she would be interested in working for him. He said he had formed a new company with his brother. She declined. He asked her to keep the conversation confidential.

Teresa Ulrich testified she had transcribed for King from June or July 2012 through May 2013. She worked solely with King's office manager, Vangi Rovero, and another transcriber, Jen Wtulich. Rovero assigned the work to transcribers working for King, including Teresa. Most of their communications were by email.

Teresa said that after her husband, John Ulrich, was terminated from his employment in February 2013, he began to consider opening a transcription business. It was his idea to form Phoenix and make her brother, Mark Mazza, the registered agent. He offered Mark the opportunity to become part of Phoenix because Mark was unemployed. Her husband named the new company Phoenix.

14

They anticipated their potential customers would be "different courts in the different counties that John went out and contacted." Teresa said she did not think about talking to Frank Ulrich or seeking his advice about the transcription business, but she did speak to Jen Wtulich toward the end of March 2013. When Phoenix was formed, Teresa and John worked out of their home.

According to Teresa, when her husband formed Phoenix, she knew her brother-in-law, Frank Ulrich, was "involved" with King. She did not view the formation of a new business as "competitive" with Frank Ulrich. She did not know whether Frank Ulrich had an ownership interest in King; she did not know who owned King.

In March 2013, when John Ulrich formed Phoenix, he contacted two transcribers, his niece and her friend. Both had worked for King. John also decided on the necessary equipment and the software. They used WordPerfect to type transcripts, Microsoft Word to prepare invoices, and AccountEdge for their accounting. Teresa had never heard of AccountEdge before Phoenix began using it.

Froonjian believed Phoenix had obtained data from King's accounting software because the number on Phoenix's first invoice was sequential to invoices King had generated. Teresa explained how Phoenix's first invoice was

A-5034-15T1

numbered. The number was 00030404. Following the leading zeros, the number "03" represented the month, March. Next, the "04" represented the date, March 4. She used these digits to memorialize the date the business started. The last two digits, "04" represented the number of times she altered the layout of the invoice. She said she revised it four times before she liked the way it looked.

Once Phoenix was operational, Teresa asked Jen Wtulich if she would transcribe for Phoenix. Three others who transcribed for King, including defendant Patricia Wtulich, contacted Teresa. She asked them if they would transcribe for Phoenix. According to Froonjian, between March and June 2013, seven transcribers who had worked exclusively for King stopped transcribing for King, became listed on the judicial website, and eventually began transcribing for Phoenix.

Teresa testified her husband solicited the courts in Bergen, Essex, Hudson, Middlesex, Passaic, and Sussex counties. Phoenix began getting work from the courts, more from Bergen and Essex Counties than from Hudson County. When Phoenix began receiving transcription work from the courts and Teresa began interacting with court personnel, no one asked if she was related to Frank Ulrich. During the first year Phoenix existed, it received approximately eighty percent of its work from Bergen and Essex Counties. In March 2013, when Phoenix

began getting work, the three transcribers who did the work had previously transcribed for King.

Teresa Ulrich admitted there came a time when Phoenix made payments to Frank Ulrich by checks made out to cash. Confronted with evidence of such checks issued between April and September 2013, she acknowledged writing the checks but claimed not to know to whom they were ultimately given. When her husband would request such a check, she would issue it. She did not ask where the checks were going. Ultimately, she learned the checks had been given to her brother-in-law, Frank Ulrich. When she asked her husband why Frank Ulrich was getting checks, he said Frank needed money and the checks were loans. There was no documentation, however, reflecting loans to Frank Ulrich.

In addition to the "loans," beginning in May 2013, Phoenix paid for Frank Ulrich's car payment, phone, and cable. When King filed its lawsuit, Phoenix retained a law firm to represent the defendants, including Frank Ulrich.

Phoenix's "sales" from its inception in March 2013 through August of that year averaged $20,000 to $40,000 per month, mostly for work Phoenix performed for the courts in Bergen and Essex Counties. Asked if she considered Phoenix a competitor of King, Teresa Ulrich replied she did not view it as

competition. She understood the courts assigned work on a rotational basis, without exception.

John Ulrich's testimony was substantially consistent with that of his wife. He, too, testified he did not speak to his brother, Frank Ulrich, about going into the transcription business. He claimed he did not know what his brother Frank did when Frank worked for King. Asked how Phoenix got its name, John Ulrich said the name he intended to use was not available in New Jersey. Whoever notified him the name he preferred was unavailable also suggested either the name Phoenix or several names that included Phoenix.

For accounting software, John Ulrich selected AccountEdge, because it was basic business software, a former business associate had used it, and it was rated one of the top three accounting packages by PC Magazine. He denied knowing King used the same software.

When John began to solicit business from court transcription clerks, he started with his home county, Passaic. He eventually developed marketing material that he delivered to court transcription clerks in five or six other counties. Eventually, Phoenix began to receive approximately eighty percent of its work from Bergen and Essex Counties.

A-5034-15T1

Between March and July 2013, John Ulrich learned Frank was no longer employed by King. John understood King had let Frank go and was not paying him. John was not privy to information about who owned King, and Frank discussed nothing about such ownership with his brother. Although confronted with telephone bills documenting numerous calls between Frank's phones and John's phones between January 1, 2013, and April 12, 2013, John Ulrich steadfastly denied discussing Phoenix with his brother. He testified he did not remember the content of any of the calls.

Frank Ulrich denied any involvement with Phoenix. Questioned about King's AccountEdge software, he said it was a software program that could not be copied. During his employment with King, he did make backup copies of the data files, which he kept at his home. When he was terminated, he took his office computer with him. When King demanded he produce it during discovery, he was unable to do so, claiming the hard drive had been corrupted. He denied providing his brother, John Ulrich, with any data or other information from or relating to King's tracking and accounting software. Frank Ulrich also denied referring any transcribers to Phoenix.

Frank Ulrich was examined in detail about his phone records from January through September 2013. From January 1 through February 13 — while John

was still employed with his previous employer — Frank's phone records showed no outgoing or incoming calls to or from his brother. During that time, calls were made on nearly a daily basis to the Bergen County court transcription unit and three transcribers who would eventually leave King and work for Phoenix. Between February 14 and 28, twenty-seven calls were exchanged between Frank's phone and his brother's phone. Frank Ulrich denied remembering either the purpose or content of the calls. The day before Phoenix was formed, calls from Frank Ulrich's phone included six to his brother and one to the attorney who formed Phoenix. Frank Ulrich nonetheless insisted he had no discussions with the attorney about Phoenix.

Once Phoenix was formed, the calls between Frank's phone, the transcription unit in Bergen County, and transcribers who formerly transcribed for King, became a regular occurrence. In mid-March, calls from Frank's phone began to be placed to the Essex County transcription unit as well. In addition, calls from Frank's phone were placed to Phoenix and to a company that facilitated conference calls placed by attorneys. That company became a client of Phoenix.

When Frank testified, he claimed to have no memory of any of the calls. He could not explain why, in view of his professed non-involvement with

A-5034-15T1

Phoenix, his phone records showed numerous calls on a nearly daily basis to and from Phoenix, to court transcription units, to court transcription clerks, to transcribers, and to a potential Phoenix customer. As previously noted, Phoenix's "sales" from its inception in March 2013 through August of that year averaged $20,000 to $40,000 per month, mostly for work Phoenix performed for the courts in Bergen and Essex Counties.

To prove King's damages, Gary Froonjian summarized King's revenues for 2011 through 2013 and the first three months of 2014. For example, King received $376,086.09, $415,565.23, and $263,651.29 from Bergen County in 2011, 2012, and 2013; and $434,460.86, $315,343.31, and $292,888.84 from Essex County in 2011, 2012, and 2013, respectively. The yearly average for 2013 and the first three months of 2014 was less than the yearly average for 2011 and 2012. Froonjian computed the difference, applied King's profit margin percentage, which ranged over five years from twenty-one percent to about thirty-six percent, and arrived at the amount King claimed for damages.[1] King

---

[1] Froonjian calculated the profit margin with and without deductions for "meals and entertainment expense," which he deemed excessive. In one tax year when Frank Ulrich was a King employee, the expense for meals and entertainment was $142,000. In another year, after Ulrich's employment had been terminated, the expense for meals and entertainment was $61,000.

also claimed counsel fees and costs as per the restrictive covenant in King's Operating Agreement.

## C.

Frank Ulrich limited his counterclaim proofs against King, Nielsen, and Froonjian to King's distributions. The parties stipulated that in 2013, Carl Nielsen received $133,253, Gary Froonjian $132,000, and Frank Ulrich $12,000. In 2014, Nielsen and Froonjian each received $116,000, and Frank Ulrich received nothing. In 2015, Frank Ulrich received nothing, and Nielsen and Froonjian each received $86,000.

Frank Ulrich testified his November 2012 and March 2013 distributions were supposed to be reduced by $47,000 to offset the alleged improper expenses he had paid to himself. There were to be no other offsets to his distributions. He also maintained there should have been no offsets because the expenses were proper. He received no distributions after March 2013.

## II.

Following the close of the parties' proofs, the trial court delivered an opinion from the bench. The court's comprehensive findings of fact included the determination that the three King members discussed the Operating

22

Agreement's restrictive covenant before signing it, among themselves and with counsel, and concluded its two-year term and geographic scope were reasonable.

The court also determined King's relationship with the clerks in court transcription offices was a significant and important relationship, because the clerks had a certain amount of discretion in assigning work. In making that finding, the court expressly rejected the contrary testimony of Frank, John, and Teresa Ulrich.

The court found that King, through Frank Ulrich, developed relationships with transcription clerks in Bergen and Essex counties through various means, including business and social functions. Through those means, "Frank Ulrich learned considerable information, personal, non-public, about the clerks . . . and also the transcribers who functioned as independent contractors retained by King, and also by Phoenix." The court determined that King's knowledge of transcribers' abilities gave it a competitive advantage over other transcription services. The court also determined King had a legitimate interest in protecting its knowledge about the clerks, its knowledge about transcribers, and its relationship with the clerks and the transcribers. According to the court's findings, the confidentiality provision in King's Operating Agreement protected such knowledge and information. In addition, the court found that King's

tracking and accounting software was confidential, proprietary, and protected by its Operating Agreement's restrictive covenant.

Concerning the formation of Phoenix, the court found that Mark Mazza was identified as the registered agent to conceal John and Teresa Ulrich's involvement with King. The court noted that John Ulrich had no experience in the transcription business and Teresa Ulrich had been a transcriber for King for less than one year when they formed Phoenix. Addressing the formation of Phoenix, the court found Frank Ulrich to be "an entirely incredible witness." The court determined Frank Ulrich assisted John Ulrich in the establishment of Phoenix, and that Frank Ulrich was a key to the Phoenix business enterprise, both in its establishment and its operation. The court found "simply not credible" John Ulrich's testimony that he sought no advice or help from Frank when John formed Phoenix. The court stated: "John Ulrich's testimony, Teresa Ulrich's testimony, and Frank Ulrich's testimony, all of it relative to denial of Frank Ulrich's involvement in Phoenix is absolutely incredible, and rejected by the court."

Primarily from the evidence of Frank Ulrich's phone records, but from other evidence as well, the court determined Frank Ulrich solicited work from the courts on behalf of Phoenix and solicited several transcribers who were

24

working for King to work for Phoenix. The court also rejected as incredible Frank Ulrich's testimony that he had no recollection of the telephone calls and did not solicit any business for Phoenix. The court found that Frank Ulrich's telephone calls to the attorney who formed Phoenix concerned that topic. The court concluded eight transcribers left King to do work for Phoenix as a result of the solicitations from Frank Ulrich.

The court next recounted revenues Phoenix generated, which ranged from $5,395.33 in its first month of operation, to $40,934.25 in August 2013, mostly as the result of work it received from Bergen and Essex counties. In its first year of operation, Phoenix generated gross revenue of $305,935. The court found these revenues resulted, in large part, from Frank Ulrich's work on behalf of Phoenix.

The court next found that Frank Ulrich downloaded to his home computer King's accounting and tracking software along with the data files. Phoenix used this software when it began operating. The court rejected as incredible both John Ulrich's testimony about how and why he came to use the software and Teresa's testimony about selecting the number for the first Phoenix invoice. Just as it had determined Frank Ulrich had testified untruthfully, the court found John

Ulrich and Teresa Ulrich gave false testimony about Frank Ulrich's involvement and Phoenix's use of King's software.

The court next found that Phoenix obtained a conference-calling center as a client as the direct result of Frank Ulrich's efforts. The court found "Frank Ulrich directly, or indirectly, owned, managed, was employed by, engaged in, carried on, or connected with Phoenix in February 2013 through the end of . . . calendar year 2013, and beyond that." The court concluded Frank Ulrich violated the King Operating Agreement's restrictive covenant by interfering with King's relationship with court transcription clerks, by soliciting transcribers, and by participating in the formation and operation of Phoenix. The court also concluded that as a result of Frank Ulrich's actions in diverting work and business opportunities from King, and by breaching the restrictive covenant, Ulrich caused King to suffer lost revenues and profits. The court determined the restrictive covenant served to protect King's legitimate business interests and was reasonable in duration and geographic scope.

The court also determined King had proved Frank Ulrich breached the covenant of good faith and fair dealing inherent in King's Operating Agreement, converted King's property, and engaged in unfair competition with King. The court rejected Ulrich's argument that King had not proved his breach of the

26

Operating Agreement was the proximate cause of any damage to King. The court cited Ulrich's numerous telephone calls to court transcription clerks in Bergen and Essex counties, his solicitation of transcribers, the decline in King's revenue from Bergen and Essex counties, and the corresponding increase in revenues to Phoenix from those counties. In short, the court determined that "revenues generated by Phoenix match . . . in substantial measure, revenues that were lost by King during the same period."

Strictly construing the two-year restrictive covenant, the court determined King could recover damages from February 2013, when Frank Ulrich first breached the restrictive covenant, through January 2015, the end of the two-year term. Computing the cost to King to train replacement transcribers, King's lost profits, and King's lost profits from a prospective client, the court determined King had suffered damages in the amount of $180,630.54.

The court also determined that King's Operating Agreement permitted it to recover reasonable attorneys' fees. Following its receipt of supplemental submissions from the parties, the court awarded King fees of $93,011.86. The court entered a judgment against Frank Ulrich for $273,642.40.

The court rejected Frank Ulrich's counterclaim. Ulrich sought distributions for the remainder of 2013, for 2014, and for 2015. According to Ulrich, those distributions totaled $223,084.33. The court explained:

[T]he court can imagine no more anomalous result here than that.

Frank Ulrich breached his duty of good faith and fair dealing. He breached the restrictive covenant. He actively competed against his former employer. He stole their software. He solicited their business illegally, in violation of the . . . Agreement.

He carried out many other steps in violation of the restrictive covenant, and then he came in here, and lied about it.

His testimony was an affront to the court. It was so clear that what he was involved in was a breach of this undertaking.

And to sit here for . . . [the] amount of time he was on the stand, and I think it may well have amounted to the better part of the day, I don't think a truthful word passed his lips in the course of his testimony.

So to award Frank Ulrich one cent of membership distributions after March of 2013, as I say, would be truly anomalous.

The court, as noted, subsequently awarded attorney's fees to King. The parties appealed from the final memorializing order.

28

III.

On appeal, King first argues the trial court erred by granting summary judgment to the "Phoenix defendants," John and Teresa Ulrich, their daughter, Melissa Ulrich, and Mark Mazza; and to Patricia Wtulich. King contends the court erred by imposing frivolous pleading sanctions. King argues there were material facts in dispute concerning the following issues: the dismissed defendants' knowledge of both the existence and breach by Frank Ulrich of the restrictive covenant in King's Operating Agreement; their complicity in Frank Ulrich's misappropriation of trade secrets; their tortious interference with King's business relationships; their complicity in Frank Ulrich's conversion; and their complicity in Frank Ulrich's engaging in unfair competition. King maintains it had a good faith basis for asserting each of these claims, and the court thus abused its discretion by requiring King to pay frivolous claim fees.

We "review[] an order granting summary judgment in accordance with the same standard as the motion judge." Bhagat v. Bhagat, 217 N.J. 22, 38 (2014) (citations omitted). Our first task is to determine "whether there is a genuine issue for trial." Brill v. Guardian Life Ins. Co. of Am., 142 N.J. 520, 540 (1995) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986)); accord R. 4:46-2(c). "If there is no genuine issue of fact, we then decide whether the [trial

29

court's] ruling on the law was correct." Lebron v. Sanchez, 407 N.J. Super. 204, 213 (App. Div. 2009).

Preliminarily, we note two flaws in King's argument challenging the grant of summary judgment to the Phoenix defendants. First, King does not analyze each defendant's conduct in terms of the elements of each claim pleaded in the amended complaint. Rather, King's argument focuses for the most part on John and Teresa Ulrich and implies the other defendants should have had the same knowledge John and Teresa had, and were complicit in the same conduct. The proofs on the summary judgment record do not support such a broad, sweeping theory of liability against all defendants. For example, reasonable inferences about John Ulrich — who formed Phoenix, paid Frank Ulrich from Phoenix's revenues, and steadfastly maintained in the face of overwhelming contrary evidence he never spoke to Frank about Phoenix — cannot reasonably be made about Patrica Wtulich, who lived in another state and received and returned transcription work by email.

Second, King sometimes mixes the evidence on the summary judgment motion record with the evidence adduced at trial. We must review the trial court's decision disposing of the summary judgment motion "based only on the

30

case as it unfolded to the point of the motion, including evidential materials submitted on that motion." Lebron, 407 N.J. Super. at 213.

A.

King first argues the summary judgment motion record demonstrates the Phoenix defendants and Patricia Wtulich "participated in, aided and abetted and facilitated Frank Ulrich's breach of his duties under the Operating Agreement." King alleges the other defendants are liable for having aided and abetted Frank Ulrich and for having conspired with him. Defendants counter that the restrictive covenant was unenforceable, but even if enforceable, with the exception of Frank Ulrich, defendants had no knowledge of it.

On summary judgment, the trial court found King had failed to establish the other defendants knew Frank Ulrich had breached the restrictive covenant in King's Operating Agreement. We agree with that conclusion as to the other defendants with the exception of Frank's brother, John.

King submits that both circumstantial and direct evidence established that Frank Ulrich was instrumental in the formation and operation of Phoenix, and that John and Teresa Ulrich knew Frank had agreed not to compete with King. We disagree as to Teresa Ulrich. Moreover, the summary judgment record is

31

devoid of evidence that Mark Mazza, Patricia Wtulich, or Melissa Ulrich knew anything about the restrictive covenant, let alone that Frank had breached it.

Significantly, King dismissed without prejudice its claim against Mark Mazza. There is no evidence from which a factfinder could reasonably infer that Mazza knew of Frank Ulrich's ownership interest in King, King's Operating Agreement, the circumstances under which Frank Ulrich's employment with King was terminated, or the circumstances under which Phoenix was formed. The summary judgment record is equally devoid of evidence that Patricia Wtulich knew of the King operating agreement, its terms, or Frank Ulrich's contractual obligations to King upon the termination of his employment. She lived in North Carolina and received and transmitted her work mostly through emails. Nor is there any evidence that Melissa Ulrich had any knowledge of any of these facts and events.

King's summary judgment motion presented a closer call as to Teresa Ulrich. In the deposition transcript King submitted with the summary judgment motion, Teresa testified that Phoenix was formed because her husband, John, and her brother, Mark Mazza, were out of work. Teresa was earning insufficient income to support her family. According to Teresa, John formed Phoenix. She did not participate in Phoenix's formation. Her husband solicited business, set up the accounting software Phoenix used, contacted the courts, and eventually

became a courier. Although Teresa became aware her husband was giving money derived from Phoenix to his brother, her husband told her the money was a loan. Teresa could not remember when, but at some point her husband told her Frank Ulrich was out of work. She testified that she was unaware Frank's house had gone into foreclosure.

Significantly, Phoenix included in the statement of undisputed material facts it submitted with its summary judgment motion this assertion: "Teresa, Melissa, John and Patricia did not know about the King Operating Agreement or the restrictive covenant contained in the Agreement until after King filed the lawsuit." King responded, "King is without knowledge or information sufficient to form a belief as to these allegations."[2] King submitted no evidence in opposition to the summary judgment from which a factfinder could have drawn

---

[2] King's response that it was without knowledge or information sufficient to form a belief as to the truth of this allegation is not dispositive. A judge may not merely accept as true all the allegations of a party's statement, but must consider the competent evidential materials. Brill, 142 N.J. at 540; R.4:46-2(c); see also Leang v. Jersey City Bd. of Educ., 399 N.J. Super. 329, 357 (App. Div. 2008), aff'd in part, rev'd in part, 198 N.J. 557 (2009). Here, however, the competent evidential materials, considered in their entirety, demonstrated no genuinely disputed fact as to whether Teresa Ulrich aided and abetted Frank Ulrich's breach of the restrictive covenant. We reach a different conclusion concerning John Ulrich.

a contrary inference as to Teresa. In its appellate argument, King appears to impute to Teresa the same knowledge her husband, John, had about Phoenix. The summary judgment record does not support such an imputation.

In contrast, the motion record contained significant circumstantial evidence that John Ulrich knew Frank Ulrich had agreed not to compete against King. King included in its opposition to the summary judgment the depositions of Frank, John, and Teresa Ulrich. King also included a summary of some of Frank Ulrich's telephone records, which documented his calls to Phoenix's lawyer, court transcription clerks, transcribers, and Phoenix before and after Phoenix was formed. Significantly, two transcribers who transcribed for King provided certifications concerning Frank Ulrich's attempt to solicit them to transcribe for Phoenix, as well as his admission that he and his brother had formed a new company. Equally significant, King documented in its opposition the money Phoenix was surreptitiously paying to Frank Ulrich. In the face of considerable evidence of Frank Ulrich's active and extensive participation in Phoenix, John Ulrich incredulously denied in his deposition that he had spoken to his brother about his newly formed company.

Construing these facts favorably to King, the non-moving party, a factfinder could infer that John Ulrich attempted to conceal his brother's

34

involvement with Phoenix while maintaining his brother was not involved. A factfinder could also infer John Ulrich took these measures because he knew of the restrictive covenant and knew Frank was breaching it to make Phoenix profitable. The summary judgment record suggested no other motive.

Even if John aided and abetted Frank, John is not liable if, as defendants contend, the restrictive covenant is unenforceable. "[A] noncompete agreement is enforceable 'if it "simply protects the legitimate interests of the employer, imposes no undue hardship on the employee and is not injurious to the public."'" Maw v. Advanced Clinical Commc'ns, Inc., 179 N.J. 439, 447 (2004) (quoting Ingersoll-Rand Co. v. Ciavatta, 110 N.J. 609, 628 (1988)). That is the case here. The restrictive covenant is enforceable.

When analyzing the first two prongs of this test, a court must balance "the employer's interests in protecting proprietary and confidential information and the asserted hardship on the employee." Ibid. (citing Ingersoll-Rand Co., 110 N.J. at 634-35). Courts have "recognize[d] as legitimate the employer's interest in protecting trade secrets, confidential information, and customer relations." Ingersoll-Rand Co., 110 N.J. at 628; see also Karlin v. Weinberg, 77 N.J. 408, 417 (1978) (noting that while a physician has no legitimate business interest in preventing competition, the physician does have a legitimate interest in the

protection of patient relationships); Schuhalter v. Salerno, 279 N.J. Super. 504, 512 (App. Div. 1995) (noting "the [accountant] parties' mutual covenants protected their legitimate interests in maintaining their respective client relationships"). The third prong of the test of enforceability of noncompete agreements "requires the reviewing court to analyze the public's broad concern in fostering competition, creativity, and ingenuity." Maw, 179 N.J. at 447 (citing Ingersoll-Rand Co., 110 N.J. at 63-34).

Here, Frank Ulrich was not only an employee but also a member of King. He approved of and was protected by the Operating Agreement's mutual covenants. The restrictive covenant protected not only the other two members, but also Frank Ulrich in the event one of the other members left the company. The covenant was reasonable in duration and scope. Broader public concerns were not implicated by the agreement among members of the company. We thus reject the argument that the restrictive covenant was unenforceable.

Because a factfinder could have inferred John Ulrich knew of his brother's breach of the restrictive covenant, and aided Frank Ulrich's activities, thereby enabling Phoenix to profit from Frank's violations, summary judgment should have been denied to John Ulrich and Phoenix.

New Jersey law has long recognized civil liability for co-conspirators. Louis Kamm, Inc. v. Flink, 113 N.J.L. 582, 592 (1934). "The gravamen of an action in civil conspiracy is not the conspiracy itself but the underlying wrong which, absent the conspiracy, would give a right of action." Bd. of Educ., Asbury Park v. Hoek, 38 N.J. 213, 238 (1962) (citing Middlesex Concrete Prods. & Excavating Corp. v. The Carteret Indus. Ass'n, 37 N.J. 507 (1962)). "Proof of a conspiracy makes the conspirators jointly liable for the wrong and resulting damages." Hoek, 38 N.J. at 238.

In addition, a person can be held liable for the acts of another under a theory of aiding and abetting "where one party 'knows that the other's conduct constitutes a breach of duty and gives substantial assistance or encouragement to the other so to conduct himself.'" State, Dep't of Treasury, Div. of Inv. ex rel. McCormac v. Qwest Commc'ns Int'l, Inc., 387 N.J. Super. 469, 481 (App. Div. 2006) (quoting Judson v. Peoples Bank & Trust Co., 25 N.J. 17, 29 (1957)). Last, by participating in and profiting from one party's breach of valid restrictive covenants, a third party can be held accountable for such profits. A. Hollander & Son v. Imperial Fur Blending Corp., 2 N.J. 235, 250 (1949). Summary judgment should have thus been denied as to John Ulrich and Phoenix.

B.

Summary judgment should also have been denied as to King's claim that John Ulrich tortiously interfered with King's prospective economic advantage. To prove unlawful interference with prospective economic advantage, a plaintiff must prove the following elements:

> 1. The existence of a reasonable expectation of economic advantage or benefit belonging or accruing to the plaintiff;
> 2. That the defendant had knowledge of such expectancy of economic advantage;
> 3. That the defendant wrongfully and without justification interfered with plaintiff's expectancy of economic advantage or benefit;
> 4. That in the absence of the wrongful act of the defendant it is reasonably probable that the plaintiff would have realized his/her economic advantage or benefit . . .; and
> 5. That the plaintiff sustained damages as a result thereof.
>
> [Model Jury Charges (Civil), 3.30A, "Unlawful Interference with Prospective Economic Advantage" (approved before 1984).]

From the facts King adduced on the summary judgment motion record, a factfinder could have concluded from Frank Ulrich's breach of the restrictive covenant that he wrongfully and without justification interfered with King's expectation of maintaining the economic advantage it had developed with

38

respect to its transcription work. A factfinder could have also concluded John Ulrich aided and abetted his brother by providing the means — Phoenix — that enabled Frank Ulrich to engage in the interference; by helping Frank Ulrich conceal his breach of King's operating agreement; and by compensating Frank Ulrich for the work he procured for Phoenix, work that otherwise would have gone to King. For these reasons, we reverse the summary judgment order as to John Ulrich on this claim.

C.

We reject King's contention that the trial court erroneously granted summary judgment to the Phoenix defendants and Patricia Wtulich on the remaining claims. We discuss them briefly, beginning with King's argument that it had a valid claim against the Phoenix defendants and Patricia Wtulich for misappropriation of trade secrets.

> A trade secret may consist of any formula, pattern, device or compilation of information which is used in one's business, and which gives him an opportunity to obtain an advantage over competitors who do not know or use it. It may be a formula for a chemical compound, a process of manufacturing, treating or preserving materials, a pattern for a machine or other device, or a list of customers.

A-5034-15T1

> [Rycoline Prods., Inc. v. Walsh, 334 N.J. Super. 62, 72
> (App. Div. 2000) (emphasis added) (citing Smith v.
> BIC Corp., 869 F.2d 194, 199 (3d Cir. 1989)).

Information in the public domain does not constitute a trade secret. Ibid. (citation omitted).

To determine whether certain information constitutes a trade secret, useful considerations include:

> (1) the extent to which the information is known outside of the owner's business; (2) the extent to which [the information] is known by employees and others involved in the owner's business; (3) the extent of measures taken by the owner to guard the secrecy of the information; (4) the value of the information to the owner and to his competitors; (5) the amount of effort or money expended by the owner in developing the information; and (6) the ease or difficulty with which the information could be properly acquired or duplicated by others.
>
> [Ibid. (citing Smith, 869 F.2d at 200); see also Restatement First of Torts § 757 cmt. b (Am. Law Inst. 1939).]

King claims the Phoenix defendants misappropriated information concerning the court transcription clerks, such as their names, interests, family members, and the relationship that Frank Ulrich had cultivated with them. King also asserts its trade secrets included the names of transcribers who performed

work for King and their capabilities. Last, King asserts that its software, KTS and AccountEdge, were proprietary trade secrets.

King's arguments fail for several reasons. First, King fails to allege specific facts against any of the Phoenix defendants. Rather, it emphasizes the tortious conduct of Frank Ulrich and makes conclusory assertions that other Phoenix defendants were guilty of the same conduct. For example, King asserts, "[t]he pirating away of King's transcribers is also actionable." Claiming without citing supporting evidence the transcribers "essentially sell King's services," King asserts, "Frank Ulrich and the Phoenix defendants knew the King transcribers that King used and unfairly and improperly targeted them to go to work for Phoenix." Yet, in its argument, King cites to nothing in the record to demonstrate, for example, how Mark Mazza, who never worked for King, never worked with any of the transcribers who transcribed for King, and never previously worked in any transcription business, had any knowledge whatsoever about the transcribers or King's other "trade secrets."

Nor has King produced any evidence to demonstrate how Patricia Wtulich, who lived in another state, had any relationship with any of the court transcription clerks. Similarly, King cited no evidence that transcribers who once worked for King as independent contractors had knowledge of the

existence of King's tracking and accounting software packages. Moreover, King adduced no competent evidence on the motion record that the amount of work it lost resulted from anything other than Frank Ulrich's relationships with court transcription personnel — relationships that appear to have been cultivated through his, or King's, largesse.

The names of court transcription personnel were not trade secrets. Nor were the names of the transcribers who had transcribed for King. The transcribers were known to Teresa Ulrich, Melissa Ulrich, and Pattircia Wtulich. King has cited no authority for the proposition that these three independent contractors were somehow legally bound to maintain the confidentiality of such things as the identity of colleagues. As to King's software, King did not establish the software was not available to purchase directly from retail vendors; nor was there evidence on the motion record from which a factfinder could have inferred the data Frank Ulrich procured from King was used by anyone at Phoenix. Accordingly, we reject King's argument the trial court erred by dismissing on summary judgment claims the Phoenix defendants and Patricia Wtulich misappropriated King's trade secrets.

For similar reasons, we reject King's arguments that the trial court erroneously dismissed on summary judgment King's claims against the Phoenix defendants and

Patricia Wtulich for unfair competition, and conversion. These claims fail because they are based on the proposition that the Phoenix defendants and Patricia Wtulich – as distinguished from Frank Ulrich – used either proprietary information or trade secrets to obtain transcription work from the courts. As previously explained, the summary judgment record was devoid of specific evidence that anyone other than Frank Ulrich obtained transcription work from transcription clerks as the result of using confidential information King sought to protect.

King's other arguments concerning the trial court's grant of summary judgment as to its substantive claims are without sufficient merit to warrant further discussion. <u>R.</u> 2:11-3(e)(1)(E).

D.

King also contends the trial court erred by awarding fees to Phoenix under the frivolous litigation rule, <u>Rule</u> 1:4-8, and the frivolous claim statute, N.J.S.A. 2A:15-59.1. Because the trial court's sanction and fee award were based in part on King's claims against John Ulrich, we vacate the fee award and remand the matter to the trial court. The court must reconsider the amount of fees to be assessed against King based on its claims against Mark Mazza and Patricia Wtulich. In deciding these issues, the trial court should consider all claims King asserted against these defendants in the trial court pleadings, not merely the

43

arguments King has made on appeal concerning these defendants. King's argument that it had a good faith basis for bringing claims against Mark Mazza and Patricia Wtulich are without sufficient merit to warrant further discussion. R. 2:11-3(e)(1)(E).

## IV.

King next argues the trial court committed three errors concerning King's damages. First, King contends the trial court erroneously barred King from presenting at trial certain evidence relevant to its damage claim. King had not produced the material during the discovery period. Second, King contends the trial court abused its discretion by awarding King $93,011.86 in counsel fees, a sum equaling approximately fifty percent of what King had sought. Last, King contends the court erred by not prospectively enforcing the restrictive covenant against Frank Ulrich. We are unpersuaded by King's arguments that the trial court erred in its rulings.

Concerning the evidence relevant to King's damages, the trial court cited a discovery order detailing in eighteen paragraphs the discovery — including expert reports — King was to provide to defendants. King did not serve an expert report on past or future damages. The discovery end date, November 15, 2014, passed. Summary judgment motions were decided in January 2015. In

44

April 2015, the case was transferred from the Chancery Division to the Law Division for trial.

In December 2015, more than a year after discovery ended and three months before trial began, King produced the supplemental materials now at issue. As the trial court noted, "[t]hat was done . . . without leave of court, [thirteen] months after the discovery end date . . . [It] would be impossible for the defense to respond." For those reasons, the court barred King from utilizing the material at trial.

For the same reasons, we conclude the trial court did not abuse its discretion by barring King from producing the material and relying on it at trial. Rivers v. LSC P'ship, 378 N.J. Super. 68, 80 (App. Div. 2005) (explaining that appellate courts "generally defer to a trial court's disposition of discovery matters unless the court has abused its discretion or its determination is based on a mistaken understanding of the applicable law"); accord, Bender v. Adelson, 187 N.J. 411, 428 (2006).

Nor did the trial court abuse its discretion by awarding King $93,011.86 in counsel fees. Our courts have discussed the "reasonableness" of counsel fees in a variety of cases. See, e.g., Packard-Bamberger & Co., Inc. v. Collier, 167 N.J. 427 (2001) (attorney misconduct case); Rendine v. Pantzer, 141 N.J. 292

(1995) (fee-shifting statute); <u>Kellam Assocs., Inc. v. Angel Projects LLC</u>, 357 N.J. Super. 132 (App. Div. 2003) (contractual provision in lease); <u>Scullion v. State Farm Ins. Co.</u>, 345 N.J. Super. 431 (App. Div. 2001) (suit to recover personal injury protection benefits under automobile insurance policy); <u>Yueh v. Yueh</u>, 329 N.J. Super. 447 (App. Div. 2000) (matrimonial action).

The method for determining the reasonableness of a counsel fee is calculating the lodestar – the number of hours reasonably expended multiplied by a reasonable hourly rate. <u>See</u> <u>Packard-Bamberger & Co., Inc.</u>, 167 N.J. at 445. Counsel making an application for fees and costs must comply with <u>R.</u> 4:42-9(b), which requires an affidavit of service addressing the factors enumerated by <u>R.P.C.</u> 1.5(a). <u>Scullion</u>, 345 N.J. Super. at 439. "The attorney's presentation of billable hours should be set forth in sufficient detail to permit the trial court to ascertain the manner in which the billable hours were divided among the various counsel[.]" <u>Rendine</u>, 141 N.J. at 337.

The trial court's determination need not be "unnecessarily complex or protracted, but the trial court should satisfy itself that the assigned hourly rates are fair, realistic, and accurate, or should make appropriate adjustments." <u>Ibid.</u> Once the trial court has done so, its determinations "will be disturbed only on

the rarest occasions, and then only because of a clear abuse of discretion." Id. at 317.

Here, the trial court reviewed, carefully and meticulously, the rates and time entries submitted by King's attorneys in support of their fee application. After deleting numerous time entries as excessive, the court further reduced the fee based on the time expended for pursuing frivolous litigation. The court also reduced the fee award due to time spent pursuing liability theories King asserted but did not prove.

Our review of the trial court's careful and considered decision concerning King's fee application leads us to conclude this is not one of the rarest of occasions where we should disturb the trial court's determination because of a clear abuse of discretion. No such abuse occurred here.

King's final claim – that the trial court erred in not prospectively enforcing the restrictive covenant – is also devoid of merit. First, it is not entirely clear that King properly preserved the issue for trial. During a case management conference in April 2015, while the case was still in the Chancery Division, the court inquired of King's counsel whether King was pursuing anything other than monetary damages, more than two years having passed since the lawsuit was filed, and the restrictive covenant being a two-year covenant. King's attorney

informed the court, "there may be some equitable right to extend the non-compete because of the . . . violations that have occurred already." The court responded that if King intended to pursue equitable relief, the case would be tried in May. Otherwise, it would be transferred to the Law Division for trial on all claims seeking monetary damages.

The case was transferred to the Law Division. The record is not clear as to why that would have occurred if King had continued to insist on equitable relief. Significantly, when the Law Division judge rendered his decision concerning the award of fees to King, he noted the case had "originated in the Chancery Division . . . and was pending there for about one and a half years." The judge further noted that following the grant of summary judgment in the Chancery Division to all defendants except Frank Ulrich, "in May of 2015 the Chancery Division further ordered that the case be transferred from Chancery to Law because the remaining issues were those seeking damages against Frank Ulrich, and the Chancery Division ruled that it had disposed of all of the issues that could give rise to injunctive relief."

In any event, King was not entitled to a continuing injunction. King's argument is based on Frank Ulrich's ongoing status as one of the three members of King and the applicability of the restrictive covenant to King's members.

However, King stopped paying distributions to Frank Ulrich in 2013. Under those circumstances, enforcing the restrictive covenant beyond two years would have been inequitable.

V.

In his cross-appeal, Frank Ulrich makes three arguments: the restrictive covenant was unlawful and unenforceable; King failed to prove its claim for damages; and Frank Ulrich's counterclaim should not have been dismissed. We have addressed the validity of the restrictive covenant. Frank Ulrich's remaining claims are without sufficient merit to warrant further discussion in a written opinion. R. 2:11-3(e)(1)(E).

VI.

In conclusion, we affirm the trial court orders with two exceptions. We reverse the summary judgment as to John Ulrich and Phoenix, and remand for trial on the issue of whether they are jointly liable to King, for the reasons set forth in this opinion. We leave to the parties and the trial court the issue of whether the trial shall be a trial as to liability only. John Ulrich and Phoenix were not parties to the bench trial, but if they assert King is collaterally estopped

A-5034-15T1

from relitigating damages, the trial court will have to decide that issue after appropriate briefing and argument.[3]

The second exception is the award of attorney's fees to King based on its frivolous claims as to John Ulrich, Mark Mazza, and Patricia Wtulich. That award must be reconsidered in view of our decision that summary judgment should have been denied to John Ulrich.

Affirmed in part, vacated in part, and remanded for further proceedings consistent with this opinion. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

---

[3] Our opinion should not be construed as suggesting that if successful on its liability claim against John Ulrich and Phoenix, King is either entitled or not entitled to recover counsel fees. John Ulrich and Phoenix were not parties to the King operating agreement, the document that enabled King to recover counsel fees against Frank Ulrich. That issue is not before us.